Caitlin C. Blanche (254109)
caitlin.blanche@klgates.com
K&L GATES LLP
1 Park Plaza
Twelfth Floor
Irvine, California  92614
Telephone: +1 949 253 0900
Facsimile: +1 949 253 0902

Attorneys for Defendant
CAVA GROUP, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA and THE PHOENIX INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>CAVA GROUP, INC.,<br><br>Defendant. | Case No.:  2:22-cv-8198<br><br>**DEFENDANT CAVA GROUP INC. NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1441—DIVERSITY JURISDICTION**<br><br>[Originally filed in Superior Court of the State of California for the County of Orange, Case No. 30-2022-01283040-CU-IC-CXC] |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

**PLEASE TAKE NOTICE** that Defendant CAVA GROUP, INC. ("Cava"

or "Defendant"), by and through its attorneys, hereby gives notice of removal of the

above-entitled action (the "State Court Action") from the Superior Court of the

State of California for the County of Orange – Central Justice Center, to the United

States District Court for the Central District of California.  In support of its Notice

of Removal, Cava sets forth the following:

313963207.3

1     **STATEMENT OF REMOVAL AND JURISDICTION - DIVERSITY**

2     1.     The State Court Action is a civil action over which this Court has

3 original jurisdiction under 28 U.S.C. § 1332(a) and is one that Cava may remove to

4 this Court under 28 U.S.C. § 1441(a) and (b) because there is complete diversity of

5 citizenship and the amount in controversy exceeds $75,000 exclusive of interest and

6 costs.

7     2.     By filing this Notice of Removal, Cava does not intend to waive, and

8 hereby reserves, any objection as to venue, the legal sufficiency of the claims

9 alleged in the State Court Action, and all other defenses.  Cava reserves the right to

10 supplement and amend this Notice of Removal.

11     **BACKGROUND**

12     3.     On or about September 21, 2022, plaintiffs Travelers Property

13 Casualty Company of America ("Plaintiff TPC") and The Phoenix Insurance

14 Company ("Plaintiff Phoenix" and together with Plaintiff TPC, the "Plaintiffs")

15 brought this action in the Superior Court of the State of California, County of

16 Orange.

17     4.     Cava received a copy of the summons and pleading in the State Court

18 Action on October 11, 2022, when process was served on Cava.

19     5.     In accordance with 28 U.S.C. § 1446(a), a true and correct copy of the

20 verified complaint, summons, civil coversheet and Alternative Dispute Resolution

21 (ADR) Information Package filed in the State Court Action is attached as **Exhibit**

22 **1**.

23     6.     In the Complaint, Plaintiffs, Cava's insurers, seek declaratory

24 judgment as to their obligations to Cava under various insurance policies that

25 Plaintiffs sold to Cava in relation to certain claims asserted against Cava in *Neil*

26 *Hamman and Michael Stewart, individually and on behalf of all others similarly*

27 *situated, v. Cava Group, Inc.*, Case No. 3:22-cv-593-MMA-MSB, a lawsuit

28 pending in the United States District Court for the Southern District of California

313963207.3

     NOTICE OF REMOVAL

("Underlying Lawsuit").  (*See* Complaint in Underlying Lawsuit ("Hamman Complaint") attached as "Exhibit A" to Exhibit 1).

7.      The State Court Action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332(a) and is one that Defendant may remove to this Court under 28 U.S.C. § 1441(a) and (b) because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## CITIZENSHIP OF THE PARTIES

8.      According to the Complaint, Plaintiff TPC is a "corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Connecticut."  Compl. ¶ 1.

9.      According to the Complaint, Plaintiff Phoenix is a "corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Connecticut." Compl. ¶ 2.

10.     As set forth in the Complaint, Cava is a Delaware corporation with its principal place of business in the District of Columbia. Compl. ¶ 3.

11.     No other defendants have been named or served in the State Court Action. Accordingly, complete diversity of citizenship exists.

## AMOUNT IN CONTROVERSY

12.     For this Court to have subject matter jurisdiction under 28 U.S.C. §1332(a), the amount in controversy must exceed the sum or value of $75,000.00, exclusive of interest and costs.  That threshold is met here.  Accordingly, this Court has original jurisdiction under 28 U.S.C. § 1332(a).

13.     Specifically, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdiction threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 83 (2014).  Defendant is not obligated to "research, state, and prove the plaintiff's claims for damages." *Singer v. State Farm Mut. Auto Ins. Co.*, 116 F.3d 373, 377

313963207.3

(9th Cir. 1997); *Conrad Assoc. v. Hartford Accident & Indem. Co.*, 994 F. Supp. 1196, 1198 (N.D. Cal. 1998).  Instead, a defendant can establish the amount in controversy by the allegations in the complaint, or by setting forth facts in the notice of removal that demonstrate that the amount placed in controversy by the plaintiff exceeds the jurisdictional minimum.  *Singer*, 116 F.3d at 377; *Conrad Assoc.*, 994 F. Supp. at 1198.  In other words, the district court may consider whether it is facially apparent from the complaint that the jurisdictional amount is in controversy.  *Id*.  Therefore, removal is appropriate where "reasonable assumptions" about the complaint show that the stakes exceed $75,000.  *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019); *see Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005).  Indeed, a defendant need not provide this Court with "proof" or "evidence" that the plaintiff actually will recover more than $75,000 if it prevails; rather, removal is proper as long as the amount in controversy can be met.  *See Brill*, 427 F.3d at 448-49.

14.     The amount in controversy for purposes of diversity jurisdiction is the total "amount at stake in the underlying litigation." *Theis Research, Inc. v. Brown & Bain*, 400 F.3d 659, 662 (9th Cir. 2005).  Moreover, "the amount in controversy is simply an *estimate* of the total amount in dispute, not a prospective assessment of defendant's liability." *Lewis v. Verizon Commc'n, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) (emphasis added).  "In assessing the amount in controversy, a court must assume that the allegations of the complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Campbell v. Vitran Express, Inc.*, 471 F. App'x 646, 648 (9th Cir. 2012) (citations omitted). The ultimate inquiry is what amount is put "in controversy" by the complaint, not what the defendant will actually owe. *Rippee v. Boston Mkt. Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005).

15.     Here, Plaintiffs do not expressly specify an amount at issue in their Complaint against Cava in the State Court Action.  However, Plaintiffs admit in

313963207.3

that Complaint that the amount in controversy exceeds the $25,000 jurisdictional threshold for an unlimited civil action in the State Court. Compl. ¶ 7. And, Plaintiffs further acknowledge that they seek declarations as to their obligations under the insurance policies they sold to Cava as those obligations relate to the Underlying Lawsuit. *See generally* Compl. The Underlying Lawsuit, for which Cava is entitled to insurance coverage from Plaintiffs, seeks damages of $5,000,000 against Cava. *See* Hamman Complaint at ¶ 25. Accordingly, Plaintiffs' State Court Action—seeking declaratory judgment with respect to the insurers' obligations to pay those potential damages that may be owed in the Underlying Lawsuit—meets the $75,000 amount in controversy requirement for diversity jurisdiction. Indeed, Cava has already incurred costs in the Underlying Lawsuit that have exceeded that jurisdictional amount, which Cava contends in this action should be covered by the Plaintiffs, under the insurance policies they sold to Cava. Declaration of Caitlin C. Blanche ("Blanche Decl."), ¶6.

## TIMELINESS OF REMOVAL

16.     Cava's removal is timely under 28 U.S.C. § 1446(b) as it is being filed "within 30 days after receipt by the defendant, through service, or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action . . . is based." The Complaint was filed on September 21, 2022, and Cava first received a copy of the initial pleading when it was served with process on October 11, 2022.

## REMOVAL PROCEDURES

17.     Under 28 U.S. Code § 1441(a), any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by a defendant to the district court for the district and division embracing the place where the state action is pending. Here, because the Superior Court of the State of California, County of Orange, where the State Court Action is currently

pending, is within the Central District of California, removal to the Central District of California is appropriate.

18. Cava will file a copy of this Notice of Removal with the Clerk of the Superior Court of the State of California, County of Orange, and serve a copy on Plaintiffs, as required by 28 U.S.C. § 1446(d).

**WHEREFORE**, Cava respectfully requests removal of the State Court Action from the Superior Court of the State of California County of Orange, to the United States District Court for the Central District of California.

Dated: November 9, 2022                K&L GATES LLP

By: */s/ Caitlin C. Blanche*
       Caitlin C. Blanche

       Attorneys for Defendant
       CAVA GROUP, INC.

313963207.3

NOTICE OF REMOVAL

## PROOF OF SERVICE

I, Lisa Enswiler, declare:

I am a citizen of the United States and employed in Santa Clara County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 620 Hansen Way, Palo Alto, California  94304.  On November 9, 2022, I served a copy of the within document(s):

- **DEFENDANT CAVA GROUP INC. NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1441—DIVERSITY JURISDICTION; DECLARATION OF CAITLIN C. BLANCHE IN SUPPORT OF NOTICE OF REMOVAL; CIVIL COVER SHEET**

☒     by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

Donna J. Vobornik, donna.vobornik@dentons.com
Joel M. Graczyk, joel.graczyk@dentons.com
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

Kathryn Lafferty Ignash, kathryn.ignash@dentons.com
4675 MacArthur Court, Suite 1250
Newport Beach, CA 92660

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 9, 2022, at Palo Alto, California.


*/s/ Lisa Enswiler*
Lisa Enswiler

RECYCLED PAPER

# Exhibit 1

DENTONS US LLP
DONNA J. VOBORNIK (*pro hac vice* forthcoming)
JOEL M. GRACZYK (*pro hac vice* forthcoming)
233 South Wacker Drive
Suite 5900
Chicago, IL 60606-6361
Telephone:      312 876 7370
Facsimile:      312 876 7934
Email:          donna.vobornik@dentons.com
                joel.graczyk@dentons.com

KATHRYN LAFFERTY IGNASH
4675 MacArthur Court
Suite 1250
Newport Beach, CA 92660
Telephone:      949 732 3700
Facsimile:      949 732 3739
Email:          kathryn.ignash@dentons.com

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF ORANGE**

| | |
|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA and THE PHOENIX INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>CAVA GROUP, INC.,<br><br>Defendant. | No. 30-2022-01283040-CU-IC-CXC<br><br>VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT<br><br>Judge: Assigned for All Purposes<br>Judge Randall J. Sherman<br><br>Date Action Filed:     September 21, 2022<br><br>DEMAND FOR JURY TRIAL |

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs Travelers Property Casualty Company of America ("TPC") and The Phoenix Insurance Company ("Phoenix," and collectively with TPC, "Travelers"), by and through undersigned counsel, bring this action for declaratory judgment pursuant to California Civil Procedure Code § 1060 and in support state as follows:

**PARTIES**

1.      TPC is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Connecticut.

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT
US_ACTIVE\122301480\V-11

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

2.      Phoenix is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Connecticut.

3.      Defendant Cava Group, Inc. ("Cava") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the District of Columbia.

## NATURE OF THE ACTION

4.      This is an action for declaratory judgment pursuant to California Civil Procedure Code §1060 for the purposes of determining questions of actual controversy between Travelers and Cava and construing their respective rights and legal obligations arising from various contracts of liability insurance that Travelers issued to or for the benefit of Cava ("Travelers Policies").

5.      Cava has demanded that Travelers defend and/or indemnify it under the Travelers Policies with respect to claims asserted against Cava in *Neil Hamman and Michael Stewart, individually and on behalf of all others similarly situated, v. Cava Group, Inc.*, Case No. 3:22-cv-593-MMA-MSB, a lawsuit pending in the United States District Court for the Southern District of California ("Underlying Lawsuit").

6.      Travelers denies having any obligation to defend or indemnify Cava with respect to the Underlying Lawsuit under the Travelers Policies.  Travelers has, however, agreed to defend Cava pursuant to a reservation of rights, specifically subject to the right to withdraw from such defense and a claim for recoupment.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action because it arises out of Cava's claim for insurance coverage with respect to the Underlying Lawsuit, which is a class action lawsuit pending in California that alleges violations of California law.  The amount in controversy exceeds $25,000 and therefore exceeds the minimum jurisdictional amount for unlimited civil cases.

8.      This Court has personal jurisdiction over Cava because it transacts business in California and because it seeks insurance coverage with respect to the Underlying Lawsuit, which was brought by California plaintiffs asserting claims against Cava on behalf of themselves and a class of California residents arising out of Cava's sale of products in California.

VERIFIED COMPLAINT

9.      Venue is proper because Cava seeks insurance coverage for the Underlying Lawsuit, which asserts claims on behalf of all persons in California who purchased Cava's products, and because Cava's operations in California include locations in Orange County.

10.     This declaratory judgment action is properly designated for the Complex Civil Division in Orange County because it is a dispute regarding insurance coverage for an underlying class action lawsuit asserting, among others, consumer protection claims.

## THE TRAVELERS POLICIES

### The Primary Policies

11.     Travelers issued the following six primary policies to or for the benefit of Cava ("Travelers Primary Policies"):

| Insurer | Policy Number | Policy Period |
|---|---|---|
| Phoenix / TPC (in California) | P-630-2J032014-PHX-17 | 2/27/17 – 2/27/18 |
| Phoenix / TPC (in California) | P-630-2J032014-PHX-18 | 2/27/18 – 8/1/18 |
| Phoenix | P-630-0L688685-PHX-18 | 8/1/18 – 8/1/19 |
| TPC | TJ-EXGL-9D896321-TIL-19 | 8/1/19 – 8/1/20 |
| TPC | TJ-EXGL-9D896321-TIL-20 | 8/1/20 – 8/1/21 |
| TPC | TJ-EXGL-9D896321-TIL-21 | 8/1/21 – 10/1/22 |

12.     All of the Travelers Primary Policies include Coverage A, Bodily Injury and Property Damage Liability, and Coverage B, Personal and Advertising Injury Liability, subject to various conditions and exclusions.

13.     Coverage A of the Travelers Primary Policies provides in relevant part as follows:

a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

- 3 -
VERIFIED COMPLAINT

. . . .

  b. This insurance applies to "bodily injury" and "property damage" only if:

    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]

    (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

  14. The Travelers Primary Policies define "occurrence" in relevant part to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

  15. Coverage B of the Travelers Primary Policies provides in relevant part as follows:

  a. We will pay those sums that the insured becomes legally obligated to pay as damages [during the policy period] because of ["personal injury" or "advertising injury"] to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for ["personal injury" or "advertising injury"] to which this insurance does not apply. . . .

  b. This insurance applies to ["personal injury" or "advertising injury"] caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

  16. For the years 2019-2022, the Travelers Primary Policies require payment of a self-insured retention, providing that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages . . . *but only to the extent that the amount of such damages exceeds the applicable self-insured retention*." (Emphasis added.) (*See* Self-Insured Retentions Endorsement.)

  17. For the years 2017-2019, the Travelers Primary Policies define "bodily injury" to mean:

    bodily injury, mental anguish, mental injury, shock, fright, disability, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time.

- 4 -

VERIFIED COMPLAINT

(*See* Xtend Endorsement for Service Industries.)

18.     The Travelers Primary Policies define "bodily injury" to mean:

For the years 2019-2020:

    a.    Physical harm, including sickness or disease, sustained by a person; or

    b.    Mental anguish, injury or illness, or emotional distress, resulting at any time from such physical harm, sickness or disease.

For the years 2020-2022:

    a.    Physical harm, including sickness or disease; or

    b.    Mental anguish, injury or illness, emotional distress, shock, fright, disability or humiliation;

sustained by a person.

(*See* Extension of Coverage – Bodily Injury endorsement.)

19.     The Travelers Primary Policies define "property damage" in relevant part to mean:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(For the years 2017-2019, see Amendment of Coverage – Property Damage endorsement.)

20.     The Travelers Primary Policies define "advertising injury" in substantially similar terms to mean:

    a.    . . . injury, other than "personal injury", caused by one or more of the following offenses:

        (1)    Oral or written publication, including publication by electronic means, of material in your "advertisement" that slanders or libels a person or organization or disparages a person's or

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

- 5 -

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

organization's goods, products or services, provided that the claim is made or the "suit" is brought by a person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged;

(2)    Oral or written publication, including publication by electronic means, of material in your "advertisement" that:

    (a)    Appropriates a person's name, voice, photograph or likeness; or

    (b)    Unreasonably places a person in a false light; or

(3)    Infringement of copyright, "title" or "slogan" in your "advertisement", provided that the claim is made or the "suit" is brought by a person or organization that claims ownership of such copyright, "title" or "slogan".

b.    Includes "bodily injury" caused by one or more of the offenses described in Paragraph a. above.

(*See* Amendment of Coverage B – Personal and Advertising Injury Liability endorsement to the 2017-2019 Travelers Primary Policies.)

21.    The Travelers Primary Policies define "personal injury" to mean:

a.    . . . injury, other than "advertising injury", caused by one or more of the following offenses:

(1)    False arrest, detention or imprisonment;

(2)    Malicious prosecution;

(3)    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, provided that the wrongful eviction, wrongful entry or invasion of the right of private occupancy is committed by or on behalf of the owner, landlord or lessor of that room, dwelling or premises;

(4)    Oral or written publication, including publication by electronic means, of material that slanders or libels a person or organization or disparages a person's or

- 6 -
VERIFIED COMPLAINT

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

organization's goods, products or services, provided that the claim is made or the "suit" is brought by a person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged; or

    (5)    Oral or written publication, including publication by electronic means, of material that:

        (a)    Appropriates a person's name, voice, photograph or likeness; or

        (b)    Unreasonably places a person in a false light.

    b.    Includes "bodily injury" caused by one or more of the offenses described in Paragraph a. above.

(*See* Amendment of Coverage B – Personal and Advertising Injury Liability endorsement to the 2017-2019 Travelers Primary Policies.)

    22.    Each of the Travelers Primary Policies contains Pollution Exclusions on both Coverage A and Coverage B as follows:

For the years 2017-2019, Coverage A:

This insurance does not apply to:

. . . .

    f.    Pollution

        (1)    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

        (a)    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. . . .

        . . . .

        (d)    At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in

VERIFIED COMPLAINT

connection with such operations by such insured, contractor or subcontractor. . . .

. . . .

(2)    Any loss, cost or expense arising out of any:

        (a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants" . . . .

(*See* Amendment of Coverage – Pollution endorsement to the 2017-2019 Travelers Primary Policies.)

For the years 2019-2022, Coverage A:

This insurance does not apply to:

. . . .

f.    Pollution

    (1)    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

        (a)    At or from any premises, site or location which is or was at any time owned, occupied or managed by, or rented or loaned to, any insured. . . .

        . . . .

        (e)    Which arises out of "your product".

        . . . .

    (2)    Any loss, cost or expense arising out of any:

        (a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants" . . . .

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

- 8 -

VERIFIED COMPLAINT

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

(*See* Exclusion – All Pollution Injury or Damage endorsement to the 2019-2022 Travelers Primary Policies.)

For the years 2017-2022, Coverage B:

This insurance does not apply to:

. . . .

m.    Pollution

["Personal injury" or "advertising injury"] arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n.    Pollution-Related

Any loss, cost or expense airing out of any:

(1)    Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants" . . . .

(*See* Amendment of Coverage B – Personal and Advertising Injury Liability endorsement to the 2017-2019 Travelers Primary Policies.)

23.    The Travelers Primary Policies define "pollutants" to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed."

24.    The Travelers Primary Policies define "your product" in relevant part to mean:

(1)    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by

(a)    You;

(b)    Others trading under your name; or

(c)    A person or organization whose business or assets you have acquired; and

(2)    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

- 9 -
VERIFIED COMPLAINT

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

b.    ["Your Product"] Includes:

(1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2)    The providing of or failure to provide warnings or instructions.

### The Excess Policies

25.    Travelers issued the following six excess policies to or for the benefit of Cava ("Travelers Excess Policies," and together with the Travelers Primary Policies, the "Travelers Policies"):

| Insurer | Policy Number | Policy Period |
|---------|---------------|---------------|
| TPC | CUP-2J053870-17-43 | 2/27/17 – 2/27/18 |
| TPC | CUP-4J452262-18-43 | 2/27/18 – 8/1/18 |
| TPC | CUP-0L731262-18-43 | 8/1/18 – 8/1/19 |
| TPC | ZUP-81N1827A-19-NF | 8/1/19 – 8/1/20 |
| TPC | ZUP-81N1827A-20-NF | 8/1/20 – 8/1/21 |
| TPC | CUP-4S964564-21-NF | 8/1/21 – 10/1/22 |

26.    For the years 2017-2019, the Travelers Excess Policies include Coverage A, Bodily Injury and Property Damage Liability, and Coverage B, Personal Injury and Advertising Injury Liability, subject to various conditions and exclusions.  Together, Coverage A and Coverage B provide in relevant part as follows:

a.    We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies.

This insurance applies to "bodily injury" or "property damage" only if:

(i)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place anywhere in the world;

- 10 -
VERIFIED COMPLAINT

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

(ii)   The "bodily injury" or "property damage" occurs during the policy period . . . .

This insurance applies to "personal injury" or "advertising injury" caused by an "offense" committed during the policy period, anywhere in the world.

27.   For the years 2017-2019, the Travelers Excess Policies define "occurrence" as in the Travelers Primary Policies. (*See supra* ¶ 14.)

28.   For the years 2017-2019, the Travelers Excess Policies define "bodily injury" to mean:

bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time.

29.   The 2017-2019 Travelers Excess Policies define "property damage" in relevant part as in the Travelers Primary Policies. (*See supra* ¶ 19; *see also* Amendment of Coverage – Property Damage endorsement to the 2017-2019 Travelers Excess Policies.)

30.   For the years 2017-2019, the Travelers Excess Policies define "advertising injury" and "personal injury" as in the Travelers Primary Policies. (*See supra* ¶¶ 20 and 21.)

31.   For the years 2019-2022, the Travelers Excess Policies include Coverage A, Excess Follow-Form Liability, and Coverage B, Umbrella Liability, subject to various conditions and exclusions.

Coverage A provides in relevant part:

1.   We will pay on behalf of the insured those sums, in excess of the "applicable underlying limit", that the insured becomes legally obligated to pay as damages to which Coverage A of this insurance applies, provided that the "underlying insurance" would apply to such damages but for the exhaustion of its applicable limits of insurance. If a sublimit is specified in any "underlying insurance", Coverage A of this insurance applies to damages that are in excess of that sublimit only if such sublimit is shown for that "underlying insurance" in the Schedule Of Underlying Insurance.

VERIFIED COMPLAINT

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

2.      Coverage A of this insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except with respect to any provisions to the contrary contained in this insurance.

32.     The "underlying insurance" in the Schedule of Underlying Insurance for Coverage A of the 2019-2022 Travelers Excess Policies include Travelers Primary Policies, policy no. TJ-EXGL-9D896321-TIL-19 for the period 8/1/19 – 8/1/20, no. TJ-EXGL-9D896321-TIL-20 for the period 8/1/20 – 8/1/21, and no. TJ-EXGL-9D896321-TIL-21 for the period 8/1/21 – 10/1/22.

33.     Coverage A of the Travelers Excess Policies for the years 2019-2022 is subject to the same terms, conditions, agreements, exclusions, and definitions as the 2019-2022 Travelers Primary Policies, except with respect to any provisions to the contrary. To the extent Travelers has no coverage obligation to Cava with respect to the Underlying Lawsuit under the Travelers Primary Policies, coverage is not available under Coverage A of the Travelers Excess Policies.

34.     Coverage B of the Travelers Excess Policies for the years 2019-2022 provides in relevant part:

1.      We will pay on behalf of the insured those sums in excess of the "self-insured retention" that the insured becomes legally obligated to pay as damages because of "bodily injury" [or] "property damage" . . . to which Coverage B of this insurance applies. [For the years 2019-2022, Coverage B of the Travelers Excess Policies does not provide coverage for "personal injury" or "advertising injury." (*See infra* ¶¶ 35-36.)]

2.      Coverage B of this insurance applies to "bodily injury" or "property damage" only if:

    a.     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place anywhere in the world; [and]

    b.     The "bodily injury" or "property damage" occurs during the policy period . . . .

    . . . .

8.      Coverage B of this insurance does not apply to damages covered by any "underlying insurance" or that would have

been covered by any "underlying insurance" but for the exhaustion of its applicable limit of insurance.

35.    For the years 2019-2022, Coverage B of the Travelers Excess Policies does not provide coverage for "personal injury."   (See Personal Injury Exclusion – Coverage B endorsement.)

36.    For the years 2019-2022, Coverage B of the Travelers Excess Policies does not provide coverage for "advertising injury."   (See Advertising Injury Exclusion – Coverage B endorsement.)

37.    For the years 2019-2022, the Travelers Excess Policies define "occurrence," in relevant part, to mean:

> a.    With respect to "bodily injury" or "property damage":
>
> > (1)    An accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in "bodily injury" or "property damage". All "bodily injury" or "property damage" caused by such exposure to substantially the same general harmful conditions will be deemed to be caused by one "occurrence" . . . .

38.    For the years 2019-2022, the Travelers Excess Policies define "bodily injury" as in the 2019-2020 Travelers Primary Policy. (*See supra* ¶ 18.)

39.    The 2019-2022 Travelers Excess Policies define "property damage" in relevant part as in the Travelers Primary Policies. (*See supra* ¶ 19.)

40.    Each Travelers Excess Policy contains a Pollution Exclusions on each of its coverage parts as follows:

> For the years 2017-2019, Coverage A and Coverage B:
>
> This insurance does not apply to:
>
> . . . .
>
> f.    Pollution
>
> "Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the actual, alleged or threatened

Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606-6361
312 876 8000

- 13 -
VERIFIED COMPLAINT

discharge, dispersal, seepage, migration, release or escape of "pollutants", or any loss, cost, expense or damages resulting therefrom, but this exclusion does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" to which any policy of "underlying insurance" listed in the SCHEDULE OF UNDERLYING INSURANCE of the DECLARATIONS of this insurance, or any renewal or replacement thereof, applies or would apply but for the exhaustion of its limits of liability. Coverage provided will follow the same provisions, terms, definitions, exclusions, limitations and conditions of the policy(ies) of "underlying insurance" listed in the SCHEDULE OF UNDERLYING INSURANCE of the DECLARATIONS of this insurance.

For the years 2019-2022 (in substantially similar form), Coverage A:

1. With respect to COVERAGE A – EXCESS FOLLOW FORM LIABILITY, the following exclusion is added to SECTION IV - EXCLUSIONS:

Pollution

a. Damages arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants". However, this subparagraph does not apply to:

. . . .

(2) "Bodily injury":

(a) Arising out the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured . . . .

. . . .

The exceptions in Paragraphs (1) and (2) above do not apply to "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

. . . .

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

        (2)    If such "pollutants" are or were at any time transported, handled, stored, treated, disposed of or processed as waste by or for:

            (a)    Any insured; or

            (b)    Any person or organization for whom any insured may be legally responsible; or

        (3)    At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are or were at any time performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

    b.    Any loss, cost or expense arising out of any:

        (1)    Request, demand, order or statutory or regulatory requirement that any insured or any other person or organization test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants" . . . .

(*See* Pollution Exclusion with Exceptions endorsements.)

For the years 2019-2022, Coverage B:

This insurance does not apply to:

. . . .

    5.    Pollution

        a.    "Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants".

        b.    Any loss, cost or expense arising out of any:

            (1)    Request, demand, order or statutory or regulatory requirement that any insured or any other person or organization test for, monitor, clean up, remove, contain, treat,

- 15 -

VERIFIED COMPLAINT

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

1

2

detotoxify or neutralize, or in any way respond
to, or assess the effects of, "pollutants" . . . .

3   41.   For the years 2017-2019, the Travelers Excess Policies define "pollutants" to mean

4   "one or more solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot,

5   fumes, acids, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned

6   or reclaimed."

7   42.   For the years 2019-2022, the Travelers Excess Policies define "pollutants" as in the

8   Travelers Primary Policies. (*See supra* ¶ 23.)

9   **THE UNDERLYING LAWSUIT**

10   43.   On April 27, 2022, Neil Hamman and Michael Stewart ("Underlying Plaintiffs")

11   filed the Underlying Lawsuit on behalf of themselves and a purported class of similarly situated

12   individuals ("Underlying Class Members").

13   44.   On August 18, 2022, the Underlying Plaintiffs filed a First Amended Class Action

14   Complaint in the Underlying Lawsuit ("Underlying Complaint").   A copy of the Underlying

15   Complaint is attached as Exhibit A.

16   45.   The Underlying Complaints defines the Underlying Class Members as all persons

17   in California who purchased Cava's products. (Ex. A, ¶ 138.)

18   46.   The Underlying Complaint alleges that Cava's grain and salad bowl products are

19   unfit for human consumption because their packaging contains heightened levels of fluorine, which

20   the Underlying Lawsuit alleges is unsafe and an indicator of unsafe per- and polyfluoroalkyl

21   substances ("PFAS"), and that Cava's products contain harmful biocides. (*See, e.g.*, Ex. A, ¶ 1.)

22   47.   The Underlying Complaint alleges that testing commissioned by the Underlying

23   Plaintiffs' counsel in July 2022 conducted by Galbraith Laboratories identified organic fluorine

24   amounts over 100 ppm in Cava's products' packaging. (Ex. A, ¶ 12.)

25   48.   The presence of organic fluorine in these quantities allegedly indicate that Cava's

26   products contain unsafe levels of PFAS, synthetic chemicals that are harmful to the environment

27   and to humans. (*See, e.g.*, Ex. A, ¶ 13.)

28

- 16 -
VERIFIED COMPLAINT

49.     The Underlying Complaint further alleges that testing of Cava's products indicates the presence of trace amounts of synthetic biocides, which allegedly include pesticides, insecticides, and fungicides linked to cancer and other adverse effects on human health. (Ex. A, ¶¶ 15, 104-12.)

50.     Upon information and belief, exposure to PFAS was known by Cava to result in adverse health effects before the issuance of the first Travelers Policy. (Ex. A, ¶ 101.)

51.     The Underlying Complaint alleges that Cava represents to consumers that its products are "healthy" and "sustainable," representations that would allegedly cause a reasonable consumer to expect that Cava's products can be safely purchased and healthily consumed as marketed and sold. (*See, e.g.*, Ex. A, ¶ 16.)

52.     The Underlying Complaint alleges that, contrary to Cava's representations, Cava's products are not safe, healthy, or sustainable because they contain PFAS and biocides, and they pose a health risk to Cava's customers. (*See, e.g.*, Ex. A, ¶ 17-18.)

53.     Based on Cava's alleged misrepresentations about the health and safety of its products, the Underlying Complaint asserts claims against Cava for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) breach of the Implied Warranty under the Song-Beverly Consumer Warranty Act, Cal. Civ. Cod. § 1792, *et seq.* and Cal. Com. Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Fraudulent Omission or Concealment; (9) Fraudulent Misrepresentation; (10) Negligent Misrepresentation; (11) Quasi-Contract/Unjust Enrichment; and (12) Breach of Express Warranty. (Ex. A, ¶¶ 145-274.)

54.     The Underlying Plaintiffs allege that they have suffered and continue to suffer economic injuries as a result of Cava's misrepresentations and omissions, and they therefore seek relief including compensatory, statutory, and punitive damages, injunctive relief, medical monitoring, and attorneys' fees. (Ex. A, ¶¶ 20-23 & p.52.)

55.     On June 10, 2022, Cava tendered the Underlying Lawsuit to Travelers.

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

US_ACTIVE\122301480\V-11

56.     Travelers disputes that it has any obligation to defend or indemnify Cava with respect to the Underlying Lawsuit under the terms, provisions, conditions, and exclusions of the Travelers Policies.

## COUNT I
### (The Underlying Complaint Does Not Allege Bodily Injury, Property Damage, or an Occurrence)

57.     Travelers reasserts and incorporates by reference paragraphs 1-56 of this Complaint above as if fully set forth herein.

58.     Nowhere in the Underlying Complaint is there any allegation of any physical harm, mental injury, shock, fright, disability, humiliation, sickness, or disease sustained by a person.

59.     Fear of "bodily injury," does not constitute "bodily injury" as defined in the Travelers Policies.

60.     Nowhere in the Underlying Complaint is there any allegation of physical injury to tangible property or loss of use of that property.

61.     The Underlying Complaint does not allege "property damage" as defined in the Travelers Policies.

62.     The Underlying Complaint does not allege an accident or "occurrence" during the policy period of any of the Travelers Policies, as is required under the insuring agreements of the Travelers Policies.

63.     Accordingly, no coverage is provided by any of the Travelers Policies under portions of those policies providing coverage for "bodily injury" or "property damage" claims.

## COUNT II
### (The Underlying Complaint Does Not Allege Personal Injury or Advertising Injury, And Related Exclusions Also Preclude Coverage)

64.     Travelers reasserts and incorporates by reference paragraphs 1-63 of this Complaint above as if fully set forth herein.

65.     The Underlying Complaint does not allege "personal injury" as defined in the Travelers Policies.

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

VERIFIED COMPLAINT

US_ACTIVE\122301480\V-11

66.   The Underlying Complaint does not allege "advertising injury" as defined in the Travelers Policies.

67.   The Underlying Complaint does not allege *an offense* committed during the Travelers Policies' policy periods.

68.   The 2019-2022 Travelers Excess Policies explicitly exclude coverage for any "personal injury" and "advertising injury."

69.   The Underlying Complaint alleges that Cava's marketing materials describe its products as healthy and sustainable despite knowing that those products were unsafe and detrimental to human health. (*See, e.g.*, Ex. A, ¶¶ 150, 168, 194-97, 202-03, 234.) To the extent coverage under the Travelers Policies might otherwise be available for "personal injury" and/or "advertising injury," which is denied, such coverage is not available, in whole or in part, because the Material Published With Knowledge Of Falsity exclusion contained in the Travelers Policies precludes coverage for "personal injury" and "advertising injury" "arising out of oral or written publication, including publication by electronic means, of material, if done by or at the direction of the insured with knowledge of its falsity."

70.   Upon information and belief, Cava's marketing regarding its products preceded the policy periods of one or more of the Travelers Policies. To the extent coverage under the Travelers Policies might otherwise be available for "personal injury" and/or "advertising injury," which is denied, such coverage is not available, in whole or in part, because the Material Published Or Used Prior To Policy Period exclusion contained in the Travelers Policies precludes coverage for "personal injury" or "advertising injury" "arising out of oral or written publication, including publication by electronic means, of material whose first publication took place before the beginning of the policy period."

71.   The Underlying Complaint alleges failure of Cava's products to conform to advertisements and marketing materials describing them as "healthy" and "sustainable" as a result of the presence of PFAS in those products. (*See, e.g.*, Ex. A, ¶¶ 4-6.) To the extent coverage under the Travelers Policies might otherwise be available for "advertising injury," which is denied, such coverage is not available because the Quality Or Performance Of Goods -- Failure To Conform To

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

VERIFIED COMPLAINT

US_ACTIVE\122301480\V-11

Statements exclusion in the Travelers Policies precludes coverage for "advertising injury" "arising out of the failure of goods, products or services to conform with any statements or quality or performance made in your 'advertisement.'"

72.     Accordingly, no coverage is provided by any of the Travelers Policies under portions of those policies providing coverage for "personal injury" or "advertising injury" claims.

## COUNT III
### (The Pollution Exclusion Precludes Coverage)

73.     Travelers reasserts and incorporates by reference paragraphs 1-72 of this Complaint above as if fully set forth herein.

74.     PFAS are "pollutants" as defined in the Travelers Policies.

75.     The Underlying Complaint alleges that Cava packages its food products with materials that contain PFAS and that PFAS *migrates* from Cava's packaging to its food products. (*See* Ex. A, ¶¶ 45-76.)

76.     Biocides are "pollutants" as defined in the Travelers Policies.

77.     The Underlying Complaint alleges that Cava's food products are contaminated with biocides.  (*See* Ex. A, ¶¶ 104-12.)

78.     Accordingly, coverage is not available to Cava in connection with the Underlying Lawsuit under the Travelers Policies because coverage is excluded by the Pollution exclusions contained in the policies.

## COUNT IV
### (Coverage for Willful Acts Precluded by
### Cal. Ins. Code § 533 and Cal. Civ. Code § 1668)

79.     Travelers reasserts and incorporates by reference paragraphs 1-78 of this Complaint above as if fully set forth herein.

80.     The Underlying Complaint alleges that Cava misleadingly marketed, advertised, packaged, and labeled its product in a manner likely to deceive reasonable consumers.  (Ex. A, ¶ 150.)

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

- 20 -

US_ACTIVE\122301480\V-11

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

81.    The Underlying Complaint alleges that Cava's misrepresentations and omissions regarding its product reflect conduct substantially injurious to consumers, conduct that offends public policy, and conduct that is immoral, unethical, oppressive, and unscrupulous. (Ex. A, ¶ 152.)

82.    The Underlying Complaint alleges that Cava's claims, nondisclosures, and misleading statements about its product were false, misleading, and likely to deceive the consuming public. (Ex. A, ¶ 154.)

83.    The Underlying Complaint alleges that Cava suppressed the true nature of its product by describing it as healthy, safe, and sustainable without disclosing that the product contained extraordinary levels of fluorine and PFAS, which are unsafe and detrimental to human health and the environment. (Ex. A, ¶ 168.)

84.    The Underlying Complaint alleges that Cava concealed information about and affirmatively misrepresented its products despite its knowledge that it product was not healthy and sustainable, as advertised. (Ex. A, ¶¶ 202-03, 212.)

85.    The Underlying Complaint alleges that Cava willfully, falsely, and knowingly omitted material facts regarding the quality and character of its products. (Ex. A, ¶ 234.)

86.    The Underlying Complaint alleges that Cava knew that its omissions and misrepresentations regarding its product were material, and that a reasonable consumer would rely upon Cava's representations when making purchasing decisions. (Ex. A, ¶¶ 204, 213.)

87.    The Underlying Complaint alleges that Cava made misrepresentations about its product maliciously, oppressively, deliberately, and with intent to defraud consumers. (Ex. A, ¶ 242.)

88.    Cava's misrepresentations and omissions regarding its products reflect willful conduct by Cava.

89.    Any loss alleged in the Underlying Complaint was caused by Cava's willful conduct, for which Travelers has no liability under any of the Travelers Policies pursuant to California Insurance Code § 533 and California Civil Code § 1668.

VERIFIED COMPLAINT

US_ACTIVE\122301480\V-11

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

## COUNT V

90.   Travelers reasserts and incorporates by reference paragraphs 1-89 of this Complaint above as if fully set forth herein.

91.   While there is no coverage available to Cava under the Travelers Policies for the Underlying Lawsuit for the reasons set forth in Counts I-IV herein, in the alternative, coverage is barred, in whole or in part, for the following reasons:

a.   Coverage is not available for liabilities arising out of the acts or omissions of any individual or organization other than those individuals or organizations declared or described as a named insured or insured in the Travelers Policies.

b.   Coverage is not available for any "bodily injury" or "property damage" (as those terms are defined in the Travelers Policies) asserted in the Underlying Lawsuit that occurred prior to and/or subsequent to the effective dates of any Travelers Policies.

c.   Coverage is not available for any "personal injury" or "advertising injury" (as those terms are defined in the Travelers Policies) asserted in the Underlying Lawsuit caused by an offense committed prior to and/or subsequent to the effective dates of any Travelers Policies.

d.   To the extent Cava and/or its predecessors, affiliates, agents, brokers, or other representatives intentionally or unintentionally failed to disclose, or concealed, omitted, or misrepresented facts material to the risks at issue in this litigation, coverage is not available, in whole or in part, under the Travelers Policies.

e.   To the extent the Underlying Lawsuit involves or otherwise constitutes a known loss, pre-existing conditions, losses-in-progress, and/or losses that are otherwise non-contingent and non-fortuitous, including but not limited to Cava's voluntary assumption of a known risk, coverage is not available under the Travelers Policies, in whole or in part.

f.   Coverage under the Travelers Policies is not available, in whole or in part, pursuant to an Expected or Intended Injury exclusion that, in relevant part, precludes coverage

VERIFIED COMPLAINT

US_ACTIVE\122301480\V-11

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

for "bodily injury" or "property damage" "expected or intended from the standpoint of the insured."

g.   To the extent Cava's acts or failures to act gave rise to the Underlying Lawsuit and were in violation of law and/or public policy, coverage is not available, in whole or in part, under the Travelers Policies.

h.   To the extent the Underlying Lawsuit involves or otherwise constitutes claims arising out of Cava's alleged fraudulent conduct, coverage is not available, in whole or in part, under the Travelers Policies.

i.   To the extent the Underlying Lawsuit seeks relief not within the form of "damages" within the meaning of the Travelers Policies, coverage for such costs, including costs of opposing or complying with statutes, administrative regulations, fines, penalties, sanctions, punitive damages, injunctive or equitable relief, restitution or disgorgement, and/or any relief authorized under the Unfair Business Practices Act, is not available under the Travelers Policies.

j.   Coverage is not available, in whole or in part, to the extent Cava has failed to perform all conditions and obligations under the Travelers Policies.

k.   To the extent Cava had notice of the conditions, events, claims, demands, or damages asserted in the Underlying Lawsuit and failed to timely give notice to or cooperate with Travelers in accordance with the Travelers Policies, coverage is not available, in whole or in part, under the Travelers Policies.

l.   To the extent Cava failed to mitigate, minimize, or avoid any alleged injury or damage, coverage is not available, in whole or in part, under the Travelers Policies.

m.   To the extent Cava made any voluntary payment, entered into a settlement, or assumed any liability or obligation for damages or expenses, including any defense expenses incurred before tendering the Underlying Lawsuit to Travelers, without Travelers approval as provided in the Travelers Policies, coverage is not available, in whole or in part, under the Travelers Policies.

US_ACTIVE\122301480\V-11

n.  To the extent the Underlying Lawsuit has not been reduced to a final judgment or settlement that Cava is legally required to pay, indemnity is not available under the Travelers Policies.

o.  Travelers' liability, if any, under the Travelers Policies is subject to the applicable limits of liability.

p.  To the extent the Underlying Lawsuit alleges continuous or repeated exposure to substantially the same general PFAS and biocide conditions with respect to Cava's products, coverage is not available, in whole or in part, under the Travelers Policies for more than a single occurrence.

q.  Coverage is not available, in whole or in part, under the Travelers Policies pursuant to non-cumulation of liability clauses contained in those policies.

r.  To the extent Cava has not exhausted self-insured retentions included in certain of the Travelers Policies, coverage is not available, in whole or in part, under those policies.

s.  To the extent Cava has not exhausted the full limits of any applicable underlying insurance policies, coverage is not available, in whole or in part, under the Travelers Excess Policies.

t.  To the extent Cava has not satisfied any deductibles included in the Travelers Policies, coverage is not available, in whole or in part, under those policies.

u.  To the extent the Travelers Policies provide for retrospective premium determination, Travelers is entitled to additional premium payments as calculated by the method set forth in those provisions.

v.  To the extent "other insurance," as defined in the Travelers Policies, is available to Cava with respect to the Underlying Lawsuit, coverage is not available, in whole or in part, where limited by the Other Insurance conditions in the Travelers Policies.

w.  Travelers reserves the right to allocate or reallocate liability, if any liability exists, between and among the Travelers Policies and any other insurers providing coverage to Cava and/or to Cava for uninsured or self-insured periods.

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

- 24 -
VERIFIED COMPLAINT

x.     Any claims against Travelers are barred to the extent any applicable statute of limitations has lapsed.

y.     Cava's claims for coverage are or may be barred, in whole or in part, by the doctrines of waiver, laches, unclean hands and/or estoppel.

## **REQUEST FOR RELIEF**

WHEREFORE, Travelers respectfully prays as follows:

(1)     That this Court enter a declaratory judgment that, under the Travelers Primary Policies, Travelers is under no obligation to defend and/or indemnify Cava, or to pay any expenses it incurs in connection with the Underlying Lawsuit;

(2)     That this Court enter a declaratory judgment that, under the Travelers Excess Policies, Travelers is under no obligation to defend and/or indemnify Cava, or to pay any expenses it incurs in connection with the Underlying Lawsuit;

(3)     That this Court enter a judgment awarding Travelers recoupment of all defense costs paid to Cava by Travelers in connection with Cava's defense (under reservation of rights) of the Underlying Lawsuit;

(4)     In the alternative, that this Court enter a judgment declaring the extent of Travelers duties (if any) to Cava in connection with the Underlying Lawsuit;

(5)     That this Court enter a judgment awarding Travelers the attorneys' fees, costs, and expenses incurred in this action; and

(6)     That this Court enter a judgment awarding Travelers such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs Travelers Property Casualty Company of America and The Phoenix Insurance Company hereby demand a jury trial in the above-entitled action.

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

VERIFIED COMPLAINT

US_ACTIVE\122301480\V-11

1    Dated:  September 21, 2022

2

3

4    By: /s/ Kathryn Lafferty Ignash

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

DENTONS US LLP
DONNA J. VOBORNIK

By: /s/ Kathryn Lafferty Ignash
        DONNA J. VOBORNIK (*pro hac vice* forthcoming)
        JOEL M. GRACZYK (*pro hac vice* forthcoming)
        233 South Wacker Drive
        Suite 5900
        Chicago, IL 60606-6361
        Telephone:       312 876 7370
        Facsimile: 312 876 7934
        donna.vobornik@dentons.com
        joel.graczyk@dentons.com

        KATHRYN LAFFERTY IGNASH
        4675 MacArthur Court
        Suite 1250
        Newport Beach, CA 92660
        Telephone:       949 732 3700
        Facsimile: 949 732 3739
        kathryn.ignash@dentons.com

        *Attorneys for Travelers Property Casualty Company of
        America and The Phoenix Insurance Company*

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

- 26 -
VERIFIED COMPLAINT

US_ACTIVE\122301480\V-11

**VERIFICATION**

I am an Assistant Vice President in the Strategic Resolution Group of The Travelers Indemnity Company, and am authorized to make this verification on behalf of Travelers Property Casualty Company of America and The Phoenix Insurance Company, both of which are parties to this action. I have read the foregoing Verified Complaint for Declaratory Judgment and know its contents. I am informed and believe and on that ground allege that the matters stated in the Verified Complaint for Declaratory Judgment are true, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____9.20.2022_____        By: _____
                                                 SCOTT ERIKSON

DENTONS US LLP
233 SOUTH WACKER DRIVE, SUITE 5900
CHICAGO, ILLINOIS 60606-6361
312 876 8000

# EXHIBIT A

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
      slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
      aleslie@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL HAMMAN and MICHAEL STEWART, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>CAVA GROUP, INC.,<br><br>        Defendant. | Case No. 22cv0593-MMA-MSB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Neil Hamman and Michael Stewart ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Defendant Cava Group, Inc. ("Defendant").   Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF ACTION

1.     Plaintiffs bring this Class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's grain and salad bowls (the "Products"), which are unfit for human consumption because the packaging in which they are contained— and is essential and integral to delivering the Products to the consuming public[1]— contain heightened levels of organic fluorine and unsafe per-and polyfluoroalkyl substances ("PFAS").[2]   Plaintiffs also bring their case under a separate theory: several of Defendant's Products have been tested and determined to contain various cancer causing and environmentally harmful biocides, which pose an undue risk to the health and safety of consumers.

2.     Per- and polyfluoroalkyl substances ("PFAS") are a class of synthetic chemicals that have a negative impact on human health and the environment.[3] Recently, consumers have become aware of the dangers of PFAS exposure.[4]

---

[1] Due to the integral and essential nature of the packaging, the term "Products" or "Product" is used herein to denote both the Products and the Products' packaging.
[2] Discovery may reveal that additional Cava's products are within the scope of this Complaint.   Accordingly, Plaintiffs reserve the right to include additional food products identified throughout the course of discovery given the substantial similarity in the harm presented.
[3] Nat'l Inst. of Env't Health Sciences, Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS), Nat'l Insts. Of Health U.S. Dept. of Health and Human Servs., https://www.niehs.nih.gov/health/materials/perfluoroalkyl_and_polyfluoroalkyl_subs tances_508.pdf (last visited Aug. 3, 2021); Francisca Pérez, et al., Accumulation Of Perfluoroalkyl Substances In Human Tissues, 59 Environ. Int'l 354 (2013).

1

3.     At the same time, consumers also seek to minimize their exposure to harmful biocides, which also have harmful health and environmental impacts.[5]

4.     On August 5, 2020, Defendant announced to its consumers that "[a]s part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging *continues* to be responsibly sourced, compostable, functional, and *now* PFAS-free.  We will eliminate PFAS for our food packaging by mid-2021, and will publicly share progress on our commitment in the year ahead."[6] *See infra* ¶ 35.

5.     At the time of the statement, however, Defendant was in receipt of material information showing that its grain and salad bowls (the "Products") were unfit for human consumption because the packaging in which they were contained— and which are essential and integral to delivering the Products to the consuming public[7]—were not free of organic fluorine, which is the leading indicator of whether the Products contain unsafe PFAS.[8]

6.     Specifically, independent research conducted by Mind the Store and Toxic-Free Future and performed at an independent laboratory in February 2020, and

---

[4] *See e.g.* LastWeekTonight, *PFAS: Last Week Tonight With John Oliver (HBO)*, YouTube (Oct. 4, 2021), https://www.youtube.com/watch?v=9W74aeuqsiU and *FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House, https://bit.ly/3DZvZba (last visited Aug. 3, 2022).
[5] Catherine Roberts, *Stop Eating Pesticides*, Consumer Reports (Aug. 27, 2020), https://www.consumerreports.org/pesticides-in-food/stop-eating-pesticides-a1094738355/; *see also* Michala  R Birch, *et al.*, *In vitro investigation of endocrine disrupting effects of pesticides on Ca2+-signaling in human sperm cells through actions on the sperm-specific and steroid-activated CatSper Ca2+-channel*, 167 Environ. Int'l (2022), https://doi.org/10.1016/j.envint.2022.107399.
[6] Emphasis added.
[7] Due to the integral and essential nature of the packaging, the term "Product" is used herein to denote both the Product and the Product's packaging.
[8] For additional context, products containing over 100 ppm of organofluorine have recently been banned by a series of legislative bills in California due to the toxic and environmentally destructive nature of these compounds. *See California Issues New PFAS Consumer Product Regulations,* Exponent (Oct. 15, 2021), https://bit.ly/3ug4hVP.

1   published on August 6, 2020, determined that the Products' packaging contained

2   heightened levels of organic fluorine.[9]

3         7.    Mind the Store and Toxic-Free Future tested two of Defendant's grain

4   and salad bowls.  The first test revealed that the Products' packaging contained 660

5   parts per million (ppm) of total organic fluorine.

6         8.    The second test revealed that the Products' packaging contained

7   945ppm of total organic fluorine.

8         9.    Prior to the release of those results on August 6, 2020, Mind the Store

9   and Toxic-Free Future contacted Defendant and informed Defendant of those results.

10        10.   Despite the receipt of this material information, Defendant concealed

11  what it knew and instead affirmatively misrepresented that information in its

12  confusing and contradictory press release, and failing to apprise consumers of the

13  existence of organic fluorine and PFAS in its Products in the years ahead.

14        11.   Subsequent testing performed by Consumer Reports at an independent

15  laboratory more than two years later determined that the Products continued to

16  contain heightened levels of fluorine in the amount of 508.3 ppm.[10]

17        12.   Additional testing commissioned by Plaintiffs' counsel in July of 2022

18  and conducted by Galbraith's Laboratories confirmed the continued existence of

19  organic fluorine amounts over 100 ppm in the Products' packaging.

20        13.   These tests results conducted across more than two years and across

21  geography are concerning as PFAS are a group of synthetic chemicals known to be

22  harmful to both the environment and humans.  Because PFAS persist and accumulate

23  over time, they are harmful even at very low levels.  Indeed, "PFAS have been

---

[9] Jen Dickman, *et al., Packaged in Pollution: Are food chains using PFAS in packaging?*, Toxic-Free Future, https://toxicfreefuture.org/packaged-in-pollution/ (last visited Aug. 3, 2022).

[10] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited August 18, 2022).

3

1   shown to have a number of toxicological effects in laboratory studies and have been

2   associated with thyroid disorders, immunotoxic effects, and various cancers in

3   epidemiology studies."[11]

4        14.   In fact, scientists are studying—and are extremely concerned about—

5   how PFAS affect human health. Consequently, the CDC outlined "a host of health

6   effects associated with PFAS exposure, including cancer, liver damage, decreased

7   fertility, and increased risk of asthma and thyroid disease."[12]

8        15.   In addition to screening the Products for PFAS, counsel has also tested

9   Defendant's food Products for synthetic biocides and found trace amounts of these

10  harmful chemicals.

11       16.   Based on Defendant's representations, reasonable consumers—like

12  Plaintiffs who relied on Defendant's "healthy" and "sustainable" representations as

13  set out on its website and in-store signage—would expect that the Products can be

14  safely purchased and healthily consumed as marketed and sold. However, the

15  Products are not safe or healthy, posing a significant health risk to unsuspecting

16  consumers.

17       17.   Nor are the Products sustainable as packaging treated with such high

18  levels of organic fluorine are not responsibly sourced and are not compostable.

19  Additionally, food containing trace amounts of harmful biocides indicates

20  unsustainable agricultural practices in Defendant's supply chain.

21       18.   Yet, neither before nor at the time of purchase does Defendant notify

22  consumers like Plaintiffs that their Products are unsafe, unhealthy, or harmful to the

23  environment, contains heightened levels of fluorine indicating the presence of PFAS,

24  or should otherwise be approached with caution.

---

25  [11] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl
26  Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic
    Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.
27  [12] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals
    may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-
28  in-the-news/pfas-health-risks-underestimated/ (last visited Aug. 18, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

19.    Accordingly, Plaintiffs bring this Class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased Defendant's Products for the following claims: (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq.* and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Fraudulent Omission or Concealment; (9) Fraudulent Misrepresentation; (10) Negligent Misrepresentation; (11) Quasi-Contract / Unjust Enrichment; and (12) Breach of Express Warranty.

## THE PARTIES

20.    Plaintiff Neil Hamman is a natural person and citizen of California who resides in Ramona, California. Plaintiff Hamman has purchased the Products from Defendant at numerous points over the past few years, including as recently as March 2022 from a Cava located in La Jolla, California. Prior to his purchase, Mr. Hamman reviewed Defendant's marketing materials and in-store signage related to his Products, including those set out herein, including that the Products were healthy, safe, and sustainable. Mr. Hamman understood that based on Defendant's claims, that Products were healthy, safe for consumption, and otherwise a sustainable product. Mr. Hamman reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Mr. Hamman suffered and continues to suffer, economic injuries.

21.    Mr. Hamman continues to desire to purchase the Products from Defendant. However, Mr. Hamman is unable to determine if the Products are

5

actually healthy, safe, and sustainable. Mr. Hamman understands that the composition of the Products may change over time. But as long as Defendant continues to market its products as "healthy" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products. Mr. Hamman is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

22. Plaintiff Michael Stewart is a natural person and citizen of California who resides in San Diego, California. Plaintiff Stewart has purchased the Products from Defendant at numerous points over the past few years, including as recently as January 2022 from a Cava located in San Diego, California. Prior to his purchase, Mr. Stewart reviewed marketing materials and in-store signage related to his Products, including those set out herein, including that the Products were healthy, safe, and sustainable. Mr. Stewart understood that based on Defendant's claims, that Products were safe for consumption, and otherwise a sustainable product. Mr. Stewart reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Mr. Stewart suffered and continues to suffer, economic injuries.

23. Mr. Stewart continues to desire to purchase the Products from Defendant. However, Mr. Stewart is unable to determine if the Products are actually healthy, safe, and sustainable. Mr. Stewart understands that the composition of the Products may change over time. But as long as Defendant continues to market its products as "healthy" and "sustainable," he will be unable to make informed

1    decisions about whether to purchase Defendant's Products and will be unable to

2    evaluate the different prices between Defendant's Products and competitor's

3    Products. Mr. Stewart is further likely to be repeatedly misled by Defendant's

4    conduct, unless and until Defendant is compelled to ensure that the Products are

5    marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe

6    and sustainable.

7        24.    Defendant Cava Group, Inc. ("Defendant") is a foreign corporation with

8    its principal place of business located in Washington, D.C.

9                          **JURISDICTION AND VENUE**

10       25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §

11   1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"),

12   because this case is a class action where the aggregate claims of all members of the

13   proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there

14   are over 100 members of the putative class, and Plaintiffs, as well as most members

15   of the proposed class, are citizens of different states than Defendant.

16       26.    This Court has personal jurisdiction over Defendant transacts substantial

17   business in this District, has substantial aggregate contacts with this District, engaged

18   in conduct that has and had a direct, substantial, reasonably foreseeable, and intended

19   effect of causing injury to persons throughout this District, and purposefully availed

20   itself of the laws of the State of California in this District, because the acts and

21   transactions giving rise to this action occurred in this District.

22       27.    This Court is the proper venue for this action pursuant to pursuant to 28

23   U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving

24   rise to Plaintiffs' claims herein occurred in this District.

25   ///

26   ///

27   ///

28   ///

7

# FACTUAL ALLEGATIONS

## A. Food and Consumer Preferences

28. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[13]

29. At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices. One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[14]

30. These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[15]

31. Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[16]

32. Also, "nearly two-thirds (64 percent) of Americans are willing to pay more for sustainable products. . . [and] 78 percent of people are more likely to purchase a product that is clearly labeled as environmentally friendly."[17]

---

[13] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited Aug. 18, 2022).

[14] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-conent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 18, 2022).

[15] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited Aug. 18, 2022).

[16] Made Safe, "What Shoppers Want," at 3.

33.  Thus, there is enormous incentive for companies such as Defendant to market their products as safe, healthy, and sustainable.  Indeed, Defendant has repeatedly and pervasively touted these considerations as reasons to purchase the Product over competitors, creating a context for consumers to believe that the Products are indeed safe, healthy, and sustainable.  Examples of these representations are included below.

34.  These include statements made directly on Defendant's website such as "We believe you shouldn't have to choose healthy over satisfying . . . And we work hard every single day to make sure that promise stands."[18]

35.  Defendant states on its website that "At Cava, we are about our impact on our communities and the world.  As a part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free."[19]  An image of this is included below:

August 5, 2020

## Eliminating PFAS From Our Food Packaging

At CAVA, we care about our impact on our communities and on the world at large. As part of our ongoing environmental and social responsibility efforts we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free. We will eliminate PFAS from our food packaging by mid-2021, and will publicly share progress on our commitment in the year ahead.

---

[17] Maggie Hanna, Consumers make a plea for sustainability, The Produce News (June 21, 2021), https://theproducenews.com/sustainability/consumers-make-plea-sustainability.
[18] Cava, "Cava Culture," https://cava.com/culture (last accessed Apr. 26, 2022).
[19] Cava, "Newsroom," https://web.archive.org/web/20220324103526/https://cava.com/newsroom (last accessed Apr. 26, 2022).

9

FIRST AMENDED CLASS ACTION COMPLAINT             CASE NO. 22CV0593-MMA-MSB

36. Defendant furthers its image as a go-to restaurant for healthy foods, stating directly on its website that it only uses "Simple Ingredients." An example is included below:



37. Defendant also highlights these attributes in its in-store signage, stating that "Food . . . cannot be artificial" and that "Cava Grill is evolved to be smarter, healthier, and more transparent." An example of this representation is set out below:



38.     To this point, Defendant also partnered with the marketing firm, Homestead, to "[d]evelop[] visuals" that convey its sentiment to consumers.   As Homestead tells it, "[l]ively colors and honest foods led to a series of in-store posters the promote the brand's mission," including those such as the following:

 



FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

39. Indeed, Cava's CEO, Brett Schulmann, also echoed Defendant's approach to food, noting that "[p]eople are eating out more, and they're seeking higher-quality ingredients. When we take these naturally health nutritional profiles, great flavors, and fulfilling foods to a reasonable price point, we're solving a problem for a variety of consumers on the go."[20]

40. Mr. Schulmann further remarked that a part of this requires "an atmosphere of transparency[.]"[21]

41. Mr. Schulmann has also noted that Cava's "better for your body" and that "consumers are mindful about what they're ingesting[.]"[22]

42. Mr. Schulmann has also stated that "At Cava . . . We want to show consumers that sustainable behavior can be the norm, easy, enjoyable and cost less."[23]

43. Any doubt about Cava's attempt to boost its health and sustainable bona fides is dispelled by the in-depth profile of Cava written by Menus of Change, run by the Culinary Institute of America. The organization wrote that "Cava Grill . . . targets health-conscious consumers," and "emphasizes local sourcing and the quality of what it sources. The chain sells diners on transparency, simplicity, and purity."[24]

44. Plaintiffs saw and relied on Defendant's marketing, including its in-store signage and website material outlined above in making their purchases.

---

[20] QSR, "What Inspires Cava CEO Brtt Schulman," (Oct. 2017), https://www.qsrmagazine.com/start-finish-what-inspires-execs/what-inspires-cava-ceo-brett-schulman (last accessed Aug. 18, 2022).
[21] *Id.*
[22] Gary Stern, "Cava: Healthy Mediterranean Chain Expanding And Acquiring," *Forbes* (Nov. 15, 2019), https://www.forbes.com/sites/garystern/2019/11/15/cava-healthy-mediterranean-chain-expanding-and-acquiring/?sh=3987bf901434 (last accessed Aug. 18, 2022).
[23] Suzanna Blake, "How Some Operators are Striving for Better Sustainability Standards," (Jan. 2022), https://www.qsrmagazine.com/content/how-some-operators-are-striving-better-sustainability-standards (last accessed Aug. 18, 2022).
[24] Menus of Change, "Cava Grill," https://www.menusofchange.org/case-studies/cavagrill (last accessed Aug. 18, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

Plaintiffs believed that Defendant genuinely prioritized health, sustainability, and transparency, and did not expect that Defendant, who proudly touted these qualities, to hide the biggest secret of all: the existence of unsafe levels of organic fluorine which is indicative of cancer causing PFAS in its packaging, along with trace amounts of harmful biocides.

> **B.** **PFAS In Defendant's Food Packaging Is Harmful To Humans And The Environment**
>
> > **1.** **Several Tests Demonstrate That Defendant's Salad & Grain Bowls Contain Heightened Levels of Organic Fluorine, Indicating PFAS**

45. In February 2020, Mind the Store and Toxic-Free Future conducted a study of the levels of organic fluorine and PFAS in food packaging for various restaurants, including Defendant.[25]

46. Researchers stated that "[w]e found that health-conscious customers might feel good about getting a full serving of veggies, the packaging it comes in is anything but healthy. Nearly all samples tested from Cava [and other 'healthy' chains] appeared to be PFAS-treated."

47. Researchers further wrote "Think you're eating healthy? Think again. Toxic PFAS persists in packaging from health-conscious chains."



---

[25] Jen Dickman, "Packaged in Pollution: Are food chains using PFAS in packaging?" Safer Chemical Healthy Families, https://saferchemicals.org/packaged-in-pollution/.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE No. 22CV0593-MMA-MSB

48. The first test of Defendant's salad and grains bowl revealed that the packaging contained 660 parts per million of organic fluorine.

49. The second test of Defendant's salad and grains bowl revealed that the packaging contained 945 ppm of organic fluorine.

**Nearly half of tested food packaging items likely contained PFAS chemicals**

| Number of samples that tested above the fluorine screening level out of the total number tested in each category | | Burger or sandwich | | Fries, other fried items, or desserts | | Salads, warm bowls, or other meals | |
|---|---|---|---|---|---|---|---|
| | | WRAPPER | CARDBOARD CONTAINER | PAPER BAG | PAPERBOARD CONTAINER | MOLDED FIBER BOWL | MOLDED FIBER TRAY |
| BURGER KING 7,000+[1] stores | **3** out of 8 | ●○○[2] | | ●● | ○○○ | | |
| McDonald's 15,000+[1] stores | **3** out of 9 | ○○○[2] | ● | ●● | ○○○ | | |
| Wendy's 6,000+[1] stores | **1** out of 4 | ○[2] | | | ○○ | | |
| CAVA 100+ stores | **4** out of 4 | ● | | ● | | ●[2] | ● |
| freshii 300+[1] stores | **1** out of 2 | ○ | | | | ●[2] | |
| sweetgreen 100+ stores | **2** out of 2 | | | | | ●●●[1] | |
| **TOTAL** | **14** out of 29 | ●●○○○ ○○○○ | ● | ●●● ●●● | ○○○○ ○○○○ | ●●●● | ● |

[1] Number of stores in the U.S. and Canada.
[2] We collected and tested more than one of the same kind of wrapper or bowl from different locations in the U.S., but are reporting each set as 1 to reflect the number of unique items. For details, see our methodology page.

50. To avoid consumer backlash, Defendant immediately announced on August 5, 2020, the day before these test results were made public, that "we are actively working to ensure our sustainable packaging continues to be responsibly sourced, compostable, functional, and now PFAS free."

51. In response, Defendant received credit from Mind the Store and Toxic-Free Future for removing PFAS from its packaging:

52. Implicit in Defendant's response is its acknowledgment that testing for organic fluorine is a valid method to test for PFAS. Afterall, even Defendant

FIRST AMENDED CLASS ACTION COMPLAINT          CASE NO. 22cv0593-MMA-MSB

equated Mind the Store and Toxic-Free Future's findings of organic fluorine with a finding of PFAS.

53. By receiving the positive credit, Defendant avoided the consumer backlash endured by other restaurants, such as McDonald's, that were found to have high levels of organic fluorine—but none as high as Defendant—and that had not made similar public commitments.

54. For example, Mind the Store launched an online petition to have McDonald's remove PFAS from its packaging.

55. An example of the differing publicity these two restaurants received is set out below:




56. Defendant's announcement allowed it to save face, but its promises amounted to little.

---

FIRST AMENDED CLASS ACTION COMPLAINT     CASE NO. 22CV0593-MMA-MSB

57.    On March 24, 2022, Consumer Reports released its study, "Dangerous PFAS Chemicals Are in Your Food Packaging."[26]

58.    Consumer Reports noted that "[t]o see how often PFAS are still found in food containers, Consumer Reports tested more than 100 food packaging products from restaurants and grocery chains."[27]

59.    Consumer Reports wrote that "Chains that promote healthier fare such as Cava . . . also had some packaging that contained PFAS[.]"[28]

60.    Despite Defendant's representations noted above, that it's Products do not contain PFAS—which, according to Michael Hansen, PhD, senior scientist at Consumer Reports, "no company should tell consumers that their products are 100 percent free of PFAS"[29]—Defendant's Products still contained a significant amount of organic fluorine, indicating intentional use of PFAS.  These results are as follows:

## Cava

| | | | |
|---|---|---|---|
| Fiber tray for kids meal | | | 548.0 |
| Fiber bowl for grains, salad | | | 508.3 |
| Wrapper for mini Pita, pita Sandwich | | | 280.0 |
| Bag for pita chips | | | 260.0 |
| Wrapper for pitas | | | 202.0 |
| Wrapper for sides | | | 13.3 |

---

[26] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports* (Mar. 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last accessed Aug. 18, 2022).
[27] *Id.*
[28] *Id.*
[29] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

61.     Subsequent testing commissioned by Plaintiffs' counsel in July of 2022 and found 1147 ppm of organic fluorine in the fiber bowl lid and 1044 ppm of organic fluorine in the salad/grain bowl itself.

### 2. Organic Fluorine Testing Represents A Scientifically Valid Method of Testing For PFAS

62.     As noted by Consumer Reports, "test[ing] products for their total organic fluorine content . . . is the simplest way to assess a material's total PFAS content.  That's because all PFAS contain organic fluorine, and there are few other sources of the compound."[30]

63.     Indeed, this approach "is exactly what the food packaging industry does to determine whether PFAS w[ere] 'intentionally added' and can be composted or not."[31]

64.     The Biodegradable Products Institute ("BPI") has adopted 100ppm as a threshold.  Likewise, the Supply Chain Solutions Center ("SPSC") notes that it "recommends that companies systematically screen [their products] using a total fluorine method and investigate levels over 100 [ppm], which indicates intentional use."[32]

65.     SCSC notes that "[t]he total fluorine method measures all forms of PFAS in the fibers and does not identify individual PFAS.  It is an effective screening tool to detect intentionally added PFAS, and results should prompt a discussion with the supplier[.]"[33]

---

[30] Id.
[31] Ketura Persellin, "Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion," Environmental Working Group (Jan. 13, 2022), https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last accessed Aug. 18, 2022).
[32] Supply Chain Solutions Center, "Testing for PFAS in food packaging," https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/#:~:text=The%20total%20fluorine%20method%20provides,certification%20program% (last accessed Aug. 18, 2022).
[33] Id.

66. The Cancer Free Economy Network supports this conclusion, stating that "there are few standardized PFAS test methods." Accordingly, researchers may rely on "total fluorine tests [which] are indirect methods designed to measure a representative element indicative of PFAS."[34]

67. Rainier Lohmann, Director of University of Rhode Island's Lohmann Lab supports these conclusions, stating that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."

68. Finally, at least one court has also determined that fluorine testing is an appropriate measure for testing for the presence of PFAS. *See GMO Free USA v. Cover Girl Cosmetics, et al.*, Case No. 2021 CA 004786 B (D.C. Sup. Ct. June 1, 2022) ("TFUSA plausibly alleges that the product contains PFAS based on its fluorine testing.").

### 3. PFAS Migrates From Food Packaging to Food

69. On March 3, 2020, a consortium of scientists released a report in *Environmental Health* called "Impacts of food contact chemicals on human health: a consensus statement."[35]

70. The scientists stated therein that "[w]e describe areas of certainty, like the fact that chemicals migrate from food contact articles into food."

---

[34] Cancer Free Economy Network, "A Short Guide To Common Testing Methods For Per- And Polyfluoroalkyl Substances (PFAS)," https://www.bizngo.org/images/ee_images/uploads/resources/CFE_PFAS_Testing_F actSheet_Final.pdf.

[35] Jane Muncke, Anna-Maria Anderrson, Thomas Backhaus, Justin M. Boucher, Bethanie Carney Almroth, Arturo Castillo Castillo, Jonathan Chevier, Barbara A. Demeneix, Jorge A. Emmanuel, Jean-Baptiste Fini, David Gee, Birgit Geueke, Ksenia Groh, Jerrold J. Heindel, Jane Houlihan, Christopher D. Kassotis, Carol F. Kwiatowski, Lisa Y. Lefferts, Maricel V. Maffini, Olwenn V. Martin, John Peterson Myers, Angel Nadal, Cristina Nerin, Katherine E. Pelch, Seth Rojello Fernandez, Robert M. Sargis, Ana M. Soto, Leonardo Trasande, Laura N. Vanderberg, Martin Wagner, Chanqing Wu, R. Thomas Zoeller, and Martin Scheringer, "Impacts of food contact chemicals on human health a consensus statement," *Environmental Health*, 2020 19:25, https://ehjournal.biomedcentral.com/track/pdf/10.1186/s12940-020-0572-5.pdf (last visited Aug. 18, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

71.    The scientists explained that "[t]his phenomenon is known as migration and has been studied since the 1950s."

72.    The scientists determined that "new-generation PFAS [like those found in food packaging] are more mobile than the old generation PFAS, they migrate more readily into food."

73.    The scientists explained that "[c]urrent safety assessment of food contact chemicals is ineffective at protecting human health."

74.    The scientists also explained that "reducing exposure to hazardous contact chemicals contributes to the prevention of associated chronic conditions in the human population."

75.    The scientists stated that "[t]o summarize, we are concerned that current chemical risk assessment for food contact chemicals does not sufficiently protect public health."

76.    The scientists stated that "[t]here is clear scientific evidence that chemicals migrate from food contact artifacts, and it is likely that the majority of the human population is affected by these exposures." Other researchers agree.[36]

### 4.    PFAS Are Incompatible With Human Health

77.    According to leading scientists, PFAS must be treated as a single class rather than treated individually: "While a class-based approach to chemical management can pose challenges to the traditional paradigm of individual chemical risk assessment, the extreme persistence and potential for harm from thousands of PFAS . . . . demands a more efficient and effective approach.  Examples of cases in which substances with common characteristics are currently managed as a class

---

[36] *See, e.g.*, Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last accessed Aug. 18, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22cv0593-MMA-MSB

include organophosphate pesticides, organchlorine pesticides, and organohalohen flame retardants."[37]

78. The scientists explained that "[t]o date, managing the risk of PFAS has focused primarily on one chemical at a time, or a small group of PFAS. This approach has not been effective at controlling widespread exposure to this large group of chemicals with known and potential hazards."

79. The scientists stated that "assessing only small subgroups systematically ignores the majority of PFAS and underestimates the overall risk, particularly when many of the chemicals are unknown."

80. The scientists concluded that "[m]ore comprehensive solutions are needed, given that traditional approaches have failed to control widespread exposure to PFAS and resulted in inadequate public health protection."

81. In another publication, scientists wrote that "[w]hile in-depth information for each compound would be ideal for scientific understanding, it is not necessary for regulating or managing PFAS. Most importantly, it leads to undue and harmful delays in protecting human and ecological health."[38]

---

[37] Carol F. Kwiatkowski, David Q. Andrews, Linda S. Birnbaum, Thomas A. Bruton, Jamie C. DeWitt, Detlef R. U. Knappe, Maricel V. Maffini, Mark F. Miller, Katherine E. Pelch, Anna Reade, Anna Soehl, Xenia Trier, Marta Venier, Charlotte C. Wagner, Zhanyun Wang, and Arlene Blum, "Scientific Basis for Managing PFAS as a Chemical Class," Environmental Science & Technology Letters (June 30, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00255.

[38] Carol F. Kwiatkowski, David Q. Andrews, Linda S. Birnbaum, Thomas A. Bruton, Jamie C. DeWitt, Detlef R. U. Knappe, Maricel V. Maffini, Mark F. Miller, Katherine E. Pelch, Anna Reade, Anna Soehl, Xenia Trier, Marta Venier, Charlotte C. Wagner, Zhanyun Wang, and Arlene Blum, "Response to 'Comment on Scientific Basis for Managing PFAS as a Chemical Class,'" *Environmental Science & Technology Letters* 2021, 195-197 https://pubs.acs.org/doi/pdf/10.1021/acs.estlett.1c00049

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

82. Other scientists agree, finding that "[w]e know that among the few PFAS that have been well studied, common or shared adverse effects have been observed."[39]

83. The scientists wrote that "[w]e are of the opinion that highly persistent PFAS are incompatible with green chemistry[40] principles and future visions of sustainable development."

84. The scientists wrote that "[e]ven if some PFAS are considered of low health concern, there may be starting materials, breakdown products and/or other PFAS by-products of higher concern released during their lifecycle (e.g. in the case of certain fluoropolymers) or they may be of high climate / environmental concern (e.g. in the case of perfluoroalkanes and perfluoro-tert-amines)."

85. The scientists stated that "despite their diversity, PFAS do share one common structural feature that make them highly problematic, namely the presence of perfluoroalkyl moieties, resulting in their shared resistance to environmental and metabolic degradation."

86. The scientists explained that the "concerns regarding the high persistence of chemicals" include "[i]ncreasing concentrations [that] will result in increased exposures and therefore increased probabilities for known and unknown health effects, be it by individual PFAS and/or in a mixture with other substances."

87. Indeed, the health effects associated with PFAS are well known. According to the Erika Schreder, Director of Science at Toxic-Free Future,

---

[39] Ian T. Cousins, Jamie C. DewWitt, Juliane Gluge, Gretta Goldenman, Dorte Herzke, Rainier Lohmann, Carla A. Ng, Martin Scheringer, and Zhanyun Wang, "The High Persistence of PFAS is Sufficient for their Management as a Chemical Class," *Environ Sci. Process Impacts*, 2020 Dec. 16; 22(12): 2307-2312, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7784706/.

[40] According to the EPA, "[g]reen chemistry is the design of chemical products and processes that reduce or eliminate the use or generation of hazardous substances. Green chemistry applies across the life cycle of a chemical product, including its design, manufacture, use, and ultimate disposal." *See* https://www.epa.gov/greenchemistry/basics-green-chemistry.

FIRST AMENDED CLASS ACTION COMPLAINT          CASE NO. 22CV0593-MMA-MSB

1  "laboratory-based and epidemiological research has linked PFAS exposure to a

2  number of serious health concerns. Primary among them are cancer and effects on

3  lipid metabolism, but they also include immune suppression, thyroid disease, and

4  harm to reproduction."[41]

5       88.    Several authorities support these conclusions as well as others.

6       89.    The U.S. Agency for Toxic Substances and Disease Registry (ATSDR)

7  recently updated its toxicological profile for PFAS. In the new draft document, the

8  agency identified associations between human exposure to PFAS and the following

9  health concerns: pregnancy-induced hypertension/per-eclampsia, liver damage,

10  increase in serum lipids, particularly total cholesterol, increased risk of thyroid

11  disease, decreased antibody responses to vaccines, and risk of asthma.[42]

12       90.    In laboratory animals, PFAS exposure leads to liver, developmental and

13  immune toxicity, and cancer. The effects seen at the lowest exposure levels,

14  identified by ATSDR, include changes to nervous system development, decreased

15  survival of young, suppressed immune response, liver degeneration, and decreased

16  fetal and birth weights.[43]

17       91.    According to Dr. Linda S. Birnbaum, Scholar in Residence at Duke

18  University, Scientist Emeritus and Former Director of the National Institute of

19  Environmental Health Sciences (NIEH) and National Toxilogy Program: "[t]hese

20  toxic chemicals are linked to serious health problems like cancer, liver damage,

21  decreased fertility, and asthma . . . . PFAS can [also] weaken our immune system,

22  making us more vulnerable to infectious diseases like COVID-19."[44]

23       92.    Others support these conclusions. In a 2019 study, for example, the

24  U.S. Department of Health and Human Services' National Toxicology Program

[41] Erika Schreder and Jennifer Dickman, *Take Out Toxics: PFAS Chemicals in Food Packaging*, https://48h57c2l31ua3c3fmq1ne58b-wpengine.netdna-ssl.com/wp-content/uploads/2019/05/Take-Out-Toxics-Full-Report.pdf.
[42] *Id.*
[43] *Id.*
[44] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[45]

93.    The following figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[46]



---

[45]    Environmental   Protection   Agency,   PFAS   Explained, https://www.epa.gov/pfas/pfas-explained (last visited Aug. 18, 2022).

[46] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Aug. 18, 2022).

94.   The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[47]

95.   In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

96.   As noted, the harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated by the figure below.[48]



---

[47] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Aug. 18, 2022).
[48] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Aug. 18, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT          CASE NO. 22CV0593-MMA-MSB

97.     Mind the Store and Toxic-Free Future provide a similar graphic related specifically to PFAS in food packaging:



98.     And, following their introduction, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.[49]

99.     All of these harms outweigh the simple reason PFAS are used in food packaging in the first place which is simply to act "as a barrier to keep grease from escaping" and "from leaking into people's hands."[50]

---

[49] *Id.*
[50] Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021),

100. But PFAS are not necessary for this intended outcome. Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no levels of organic fluorine.[51] Accordingly, Defendant would have had knowledge that it could produce the Product packaging without the heightened levels of fluorine and PFAS inherent in its current composition.

101. Yet, Defendant chose not to, and instead concealed and affirmatively misrepresented this information to consumers, to increase revenues by the cost savings associated with the use of these chemicals.

102. This has not been without consequence to consumers, as fluorine and PFAS in food packaging migrates[52] onto the food, exposing consumers to both of these via ingestion.[53]

103. Thus, Defendant's conduct has been substantially injurious to consumers, and is actionable.

**C.    Defendant's Food Products Contain Unhealthy, Unsafe, and Unsustainable Synthetic Biocides**

104. Independent testing conducted at Agricultural and Food Testing Laboratory ("AGQ") and ordered by Plaintiffs' counsel in July 2022, reveals that several of the Products that Plaintiffs consumed[54] contain harmful and cancer inducing biocides:

---

https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last accessed Aug. 18, 2022).

[51] *See supra* n. 5.

[52] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784 (last accessed Aug. 18, 2022).

[53] *See* Nat'l Toxicology Program, Per- and Polyfluoroalkyl Substances (PFAS), https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last accessed Aug. 18, 2022).

[54] Plaintiff Stewart consumed Defendant's Pita bread, Pita chips, Falafel, Brown Rice, and Lentils. Plaintiff Hamman consumed Defendant's Pita bread, Pita chips, Falafel, and Saffron Basmati Rice.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

| Food Item | Test Results[55] |
|---|---|
| Black Lentils | Glyphosate – 22 ppb |
| Pita Bread | Glyphosate – 52 ppb |
| Pita Chips | Glyphosate – 53 ppb |
| Falafel | Acetamiprid – 18 ppb |
| Brown Rice | Chlorpyrifos – 10 ppb<br><br>Isoprothiolane – 80 ppb<br><br>Tebuconazole – 10 ppb<br><br>Tricyclazole – 24 ppb |
| Saffron Basmati Rice | Isoprothiolane – 24 ppb<br><br>Tricyclazole – 64 ppb |

105.   Glyphosate is a widely used pesticide that has been linked to cancer.[56]

106.   Acetamiprid is a neonicotinoid insecticide, that has been labeled a "potential neurodevelopmental toxin[]."[57]

107.   Chlorpyrifos is "an organophosphate pesticide that can permanently damage the developing brains of children, causing reduced IQ, loss of working memory, and attention deficit disorders."[58] In fact, "after a decades-long legal fight

---

[55] Results converted to parts per billion (ppb).

[56] Emily Dixon, *Common weed killer glyphosate increases cancer risk by 41%, study says*, CNN (Feb. 15, 2019), https://www.cnn.com/2019/02/14/health/us-glyphosate-cancer-study-scli-intl.

[57] Mohanaruban Pravinson, *et al. Acute poisoning with acetamiprid, a type of neonicotinoid insecticide causing severe lactic acidosis: A case report.* 9 SAGE open medical case reports 2050313X211059296, (2021), doi:10.1177/2050313X211059296.

[58] *Chlorpyrifos*, Earth Justice, https://earthjustice.org/features/chlorpyrifos-what-you-need-to-know (last visited Aug. 18, 2022).

and under a court-ordered deadline, the U.S. Environmental Protection Agency has finally issued a final rule banning all food uses of chlorpyrifos."[59]

108.   Isoprothiolane is a fungicide that is thought to pose a risk to aquatic ecosystems.[60]

109.   Tebuconazole is a fungicide that has been linked to reproductive harms in humans and toxic effects on aquatic life.[61]

110.   Tricyclazole is a fungicide that can lead to "decreased body weight gain and increased organ weights and others in the liver."[62]

111.   Biocides with adverse effects on humans and the environment are not "safe" or "sustainable."

112.   Likewise, consumers would not consider food contaminated with pesticide residue to be "healthy."[63]

### D.   `Defendant's Misrepresentation and Omissions Are Actionable

113.   Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as safe and sustainable when they are not in fact safe and sustainable.

114.   Plaintiffs and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product in packaging containing dangerous substances with well-known health and environmental consequences.

---

[59] *Id.*

[60] Abd Rahman, et al., *The residual level of isoprothiolane in paddy field surface water and its acute toxicity level on freshwater prawn, Macrobrachium lanchesteri,* Paddy and Water Environ.; Dordrecht (Jan 2019): 1. DOI:10.1007/s10333-018-00684-0.

[61]      *Tebuconazole,*      National      Library      of      Medicine, https://pubchem.ncbi.nlm.nih.gov/compound/Tebuconazole (last visited Aug. 18, 2022).

[62] *Risk Assessment Report,* Food Safety Commission of Japan (Jan. 2014), https://www.fsc.go.jp/english/evaluationreports/pesticide/tricyclazole_fs72.pdf.

[63] Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels*, 29 (Jan. 15, 2019), https://bit.ly/2Hy06ML.

115.  No reasonable consumer would expect that a product marketed as safe and sustainable would pose a risk to their health, safety, and wellbeing, or that it would contain dangerous levels of organic fluorine (indicator of PFAS) and trace amounts of synthetic biocides, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Products.

116.  As the Products expose consumers to organic fluorine/PFAS and biocides that pose a risk to consumers' health, the Products are not fit for consumption by humans.  Plaintiffs and the Class are further entitled to damages for the injury sustained in being exposed to high levels of organic fluorine, toxic PFAS, and harmful biocides; damages related to Defendant's conduct, and injunctive relief.

117.  Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects.  Nonetheless, Defendant concealed and affirmatively misrepresented the Product, as discussed herein.

118.  Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the organic fluorine/PFAS and harmful biocides, and its failure to disclose the existence of organic fluorine/PFAS and harmful biocides in the Product to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

119.  **WHO**:  Defendant made material misrepresentations and/or omissions of fact about the Product through in-store, website representations, and marketing statements, which include the statements that the Products are healthy, safe and sustainable.  These representations constitute omitted material information regarding

harmful chemicals in the Products packaging which is essential and integral to delivering the Products to the consumer.

120.  **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because they omitted and concealed that the Product contains substances—organic fluorine. PFAS, and biocides—that are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products are healthy, safe, and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

121.  **WHEN**: Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products packaging contained harmful substances.

122.  **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions in in-store, website representations, and marketing statements.

123.  **HOW**: Defendant made material misrepresentations and/or failed to disclose material facts regarding the Product, including the presence of heightened levels of organic fluorine, indicating PFAS, and trace amounts of harmful biocides.

124.  **WHY**:   Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

125.  **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

126. Defendant would have had actual knowledge for years that the Products packaging contains harmful chemicals such as organic fluorine/PFAS and biocides.

127. Although Defendant was aware of the deception in its marketing and advertising given the inclusion of organic fluorine/PFAS and biocides in the Product despite claims of the Product's healthiness, safety and sustainability, they took no steps to warn Plaintiffs or Class Members of risks related to organic fluorine/PFAS and biocides in the Products.

128. Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products. Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

129. Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Products are healthy, safe and sustainable.

130. Defendant concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

131. The organic fluorine and PFAS included in the formulation, design and/or manufacture of the Product packaging were not reasonably detectible to Plaintiffs and Class Members.

132. The biocides included in the food Products were also not reasonably detectable to Plaintiffs and Class Members.

133. At all times, Defendant actively and intentionally concealed the existence of the organic fluorine/PFAS and biocides and failed to inform Plaintiffs or

31

Class Members of the existence of the organic fluorine/PFAS and biocides. Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

134.   Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals.

135.   Defendant concealed or misrepresented the organic fluorine/PFAS and biocides for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

136.   As a result of Defendant's active concealment of the organic fluorine/PFAS and biocides and/or failure to inform Plaintiffs and Class Members of the organic fluorine/PFAS and biocides, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.   Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Product.

137.   Further, the causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that the Product contained heightened levels of organic fluorine/PFAS, which, at the very earliest, would have been in March 2022 following Consumer Report's highly publicized study, and trace amounts of biocides.  Plaintiffs and Class Members had no realistic ability to discern that the Product contained heightened levels of organic fluorine and PFAS until after the widely publicized Consumer Report's study. Plaintiffs and Class Members also had no way of knowing about the trace amounts of harmful biocides. Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of organic fluorine/PFAS and biocides in the Product and of the Product's true nature.

## CLASS ALLEGATIONS

138.   Plaintiffs bring this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a

1    class defined as all persons in California who purchased the Products (the "Class").

2    Excluded from the Class are persons who made such purchases for purposes of

3    resale.

4    139.   As a result of additional information obtained through further

5    investigation and discovery, the above-described Classes may be modified or

6    narrowed as appropriate, including through the use of multi-state subclasses.

7    140.   At this time, Plaintiffs do not know the exact number of members of the

8    aforementioned Class ("Class Members").  However, given the nature of the claims

9    and the number Defendant's restaurants in the California selling Defendant's

10   Product, Plaintiffs believe that Class Members are so numerous that joinder of all

11   members is impracticable.

12   141.   There is a well-defined community of interest in the questions of law

13   and facts involved in this case.   Questions of law and facts common to Class

14   Members predominate over questions that may affect individual Class Members

15   include:

16           (a)    whether Defendant misrepresented and/or failed to disclose

17                  material facts concerning the Product;

18           (b)    whether Defendant's conduct was unfair and/or deceptive;

19           (c)    whether Defendant has been unjustly enriched as a result of the

20                  unlawful conduct alleged in this Complaint such that it would be

21                  inequitable for Defendant to retain the benefits conferred upon it

22                  by Plaintiffs and the Class;

23           (d)    whether Plaintiffs and the Class sustained damages with respect

24                  to the common law claims asserted, and if so, the proper measure

25                  for their damages.

26   142.   Plaintiffs' claims are typical of those of the Class because Plaintiffs, like

27   all Class Members, purchased, in a typical consumer setting, Defendant's Product,

28   and Plaintiffs sustained damages from Defendant's wrongful conduct.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

143.   Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, have retained competent counsel experienced in prosecuting class actions, and intend to prosecute this action vigorously.   The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

144.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.   Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.   Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.   Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

### COUNT I
**(Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

145.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

146.   Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

147.   California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."   For the reasons discussed

1     above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or

2     practices in violation of California Business & Professions Code § 17200.

3         148.  By committing the acts and practices alleged herein, Defendant has

4     violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§

5     17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and

6     unfair conduct.

7         149.  Defendant has violated the UCL's proscription against engaging in

8     **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ.

9     Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's

10     Song-Beverly Act, and violations of California's False Advertising Law, in addition

11     to breaches of warranty and violations of common law.

12         150.  As more fully described above, Defendant's misleading marketing,

13     advertising, packaging, and labeling of the Product is likely to deceive reasonable

14     consumers.  In addition, Defendant have committed unlawful business practices by,

15     inter alia, making the representations and omissions of material facts, as set forth

16     more fully herein, and violating the common law.

17         151.  Plaintiffs and Class Members reserve the right to allege other violations

18     of law which constitute other unlawful business acts or practices.

19         152.  Defendant has also violated the UCL's proscription against engaging in

20     **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations,

21     practices and non-disclosures as alleged herein also constitute "unfair" business acts

22     and practices within the meaning of Business & Professions Code § 17200 *et seq*. in

23     that its conduct is substantially injurious to consumers, offends public policy, and is

24     immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct

25     outweighs any alleged benefits attributable to such conduct.

26         153.  There were reasonably available alternatives to further Defendant's

27     legitimate business interests, other than the conduct described herein as noted above.

28

154.   Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.   Defendant's claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

155.   Plaintiffs and the other Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

156.   There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

157.   Plaintiffs and the other Class Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.   Thus, they could not have reasonably avoided the injury each of them suffered.

158.   The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other California Subclass Members.

159.   Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' and the California Subclass' attorneys' fees and costs.

///

///

36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

**(Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)**

160.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

161.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

162.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

163.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

164.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

165.    Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as healthy, safe and sustainable, when in fact the Products are not healthy, safe, and sustainable and are instead, dangerous, and useless.

166.    The Products are not safe because they contain an extraordinary level of fluorine and PFAS as well as biocide in the packaging which is essential and integral to the delivery of the Products to consumers that subject unsuspecting consumers to significant health risks.

167.    Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiffs or Class Members.

168.    Defendant made partial representations to Plaintiffs and Class Members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as healthy, safe and sustainable, including on

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

the product packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health and the environment. Moreover, Defendant affirmatively misrepresented the Product despite its knowledge that the Product was not as advertised.

169. Plaintiffs and the Class Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

170. On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiffs had chosen not to wait for Defendant's response. Plaintiffs also chose not to wait for Defendant's response because Defendant has long known about its conduct as described herein. Thus, Plaintiffs' letter would not have served the purpose of the letter.

171. For those reasons, Plaintiffs filed their Complaint on April 27, 2022, seeking injunctive relief only under the CLRA. Defendant did not correct its practices.

172. Accordingly, Plaintiffs and the Class Members seek, in addition to injunctive relief, monetary damages from Defendant as permitted by Civil Code § 1782(a).

173. Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance, damages resulting from their purchases of the Products is determined to be an amount less than the premium price of the

1  Products.  Without compensation for the full premium price of the Products,
2  Plaintiffs would be left without the parity in purchasing power to which they are
3  entitled.

4      174.  Injunctive relief is also appropriate, and indeed necessary, to require
5  Defendant to provide full and accurate disclosures regarding the Products so that
6  Plaintiffs and Class members can reasonably rely on Defendant's representations as
7  well as those of Defendant's competitors who may then have an incentive to follow
8  Defendant's deceptive practices, further misleading consumers.

9      175.  Restitution and/or injunctive relief may also be more certain, prompt,
10  and efficient than other legal remedies requested herein.  The return of the full
11  premium price, and an injunction requiring either (1) adequate disclosure of the
12  organic fluorine and PFAS as well as biocide in the Products' packaging; or (2) the
13  removal of such chemicals from the Products' packaging, will ensure that Plaintiffs
14  are in the same place they would have been in had Defendant's wrongful conduct not
15  occurred, i.e., the position to make informed decisions about the purchase price of
16  the Products absent omissions and misrepresentations with the full purchase price at
17  their disposal.

18                              **COUNT III**
19  **(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code
    § 1790, *et seq.* and California Commercial Code § 2314)**

20      176.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged
21  above.

22      177.  Plaintiffs bring this claim individually and on behalf of the Class against
23  Defendant.

24      178.  Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §
25  1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer
26  goods in the State of California is accompanied by both a manufacturer's and retailer
27  seller's implied warranty that the goods are merchantable, as defined in that Act.  In
28

39

addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

179. The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

180. Plaintiffs and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

181. Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

182. Defendant impliedly warranted to retailer buyers that the Product was merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product is used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product was unsafe for consumption after exposure to Defendant's packaging. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

183. Plaintiffs and Class Members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

184. The Products were not altered by Plaintiffs or the Class Members.

185. The Products were defective at the time of sale when they it the exclusive control of Defendant. The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

186. Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

187. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

188. On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter, apprising Defendant of its breach of warranties. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations. The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiffs have chosen not to wait for Defendant's response. Plaintiffs have also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein. Accordingly, Plaintiffs' letter would not have served the purpose of the letter.

189. Plaintiffs and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
### (Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq.*)

190. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

191. Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

192. Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public. As described above, and throughout this Complaint, Defendant misrepresented the Product as healthy, safe and sustainable when, in fact, the Product was not healthy, safe or sustainable.

193. By its actions, Defendant disseminated uniform advertising regarding the Product to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

194. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health and wellbeing of Plaintiffs and the Subclass Members as well as to the environment.

195. Defendant continues to misrepresent to consumers that the Products was safe and sustainable. However, as described, this is not the case.

196. In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiffs and other Class Members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to tens of millions of dollars. Plaintiffs and Class Members were injured in fact and lost money and property as a result.

197. The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

198. As a result of Defendant's wrongful conduct, Plaintiffs and Class Members lost money in an amount to be proven at trial. Plaintiffs and Class Members are therefore entitled to restitution as appropriate for this cause of action.

199. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's

42

unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V
### (Fraud)

200. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

201. Plaintiffs bring this claim individually and on behalf of the Class.

202. At the time Plaintiffs and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as healthy, safe and sustainable.

203. Defendant affirmatively misrepresented the Products, giving the Product the appearance of a product that is indeed safe for use.

204. Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

205. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

206. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

207. Plaintiffs and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

208. Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs

1   and Class Members to sustain actual losses and damages in a sum to be determined

2   at trial, including punitive damages.

3   ### COUNT VI
    ### (Constructive Fraud)

4   209.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged

5   above.

6   210.   Plaintiffs bring this claim individually and on behalf of the Class.

7   211.   At the time Plaintiffs and Class Members purchased the Products,

8   Defendant did not disclose, but instead concealed and misrepresented, the Products

9   as discussed herein.

10  212.   Defendant affirmatively misrepresented the Products, giving the

11  Products the appearance of a product that is indeed safe for consumption and

12  otherwise sustainable.

13  213.   Defendant also knew that its omissions and misrepresentations

14  regarding the Products were material, and that a reasonable consumer would rely

15  upon its representations (and corresponding omissions) in making purchasing

16  decisions.

17  214.   Defendant had an obligation not to omit or misrepresent the Products

18  because in addition to the fact that the Products pertained to matters of safety: (a) it

19  was in the sole possession of such information; (b) it made partial representations

20  regarding the quality of the Products; (c) Plaintiffs and the Class Members relied

21  upon Defendant to make full disclosures based upon the relationship between

22  Plaintiffs and Class Members, who relied on Defendant's representations and

23  omissions, and were reasonable in doing so, with the full knowledge of Defendant

24  that it did and would have been reasonable in doing so.

25  215.   Plaintiffs and Class Members did not know—nor could they have

26  known through reasonable diligence—about the true quality of the Products.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

216.   Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

217.   Plaintiffs and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

218.   Defendant breached its duty to Plaintiffs and Class Members to make full disclosures of the safety of their Product.

219.   Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Inducement)

220.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

221.   Plaintiffs bring this claim individually and on behalf of the Class.

222.   Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

223.   Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

224.   Defendant also knew that its omissions and misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

225. Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

226. Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

227. Plaintiffs and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product.

228. Defendant intended to induce—and did, indeed, induce—Plaintiffs and Class Members into purchasing the Products based upon its affirmative representations and omissions.

229. Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Fraudulent Concealment or Omission)

230. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

231. Plaintiffs bring this claim individually and on behalf of the Class.

232. At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

233. Defendant, acting through its representatives or agents, delivered the Product to its own distributors and various other distribution channels.

234. Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

235. Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

236. Defendant made these material misrepresentations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company and that its Products are healthy, safe for use, and otherwise sustainable. The false representations were material to consumers because the representations played a significant role in the value of the Products purchased.

237. Plaintiffs and Class Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout. Plaintiffs and Class Members had no way of knowing that Defendant's misrepresentations as to the Products, and had no way of knowing that Defendant's misrepresentations were misleading.

238. Although Defendant had a duty to ensure the accuracy of the information regarding the Products, it did not fulfill these duties.

239. Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products. Such benefits came at the expense of Plaintiffs and Class Members.

240. Plaintiffs and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth. Plaintiffs' and class members' actions were justified given Defendant's misrepresentations. Defendant was in the exclusive control of material facts, and such facts were not known to the public.

241. Due to Defendant's misrepresentations, Plaintiffs and Class Members sustained injury due to the purchase of the Products that did not live up to their advertised representations. Plaintiffs and Class Members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

47

242. Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT IX
### (Fraudulent Misrepresentation)

243. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

244. Plaintiffs bring this claim individually and on behalf of the Class.

245. Defendant falsely represented to Plaintiffs and the Class that the Products were health, safe for use and otherwise sustainable.

246. Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

247. Defendant knew or should have known that its representations about the Products were false in that the Products are not healthy, not safe for consumption, and not sustainable as discussed throughout. Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

248. Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment. Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiffs' and the Class' reliance on Defendant's misrepresentations was justifiable.

249. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the

Products at all had they known of the safety risks associated with the Products and that they do not conform to Defendant's advertising and marketing.

250.   Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT X
### (Negligent Misrepresentation)

251.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

252.   Plaintiffs bring this claim individually and on behalf of the Class.

253.   Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

254.   Defendant breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

255.   Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Product was not safe for use and not sustainable.

256.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not safe for consumption and that the Products do not conform to the Product's labeling, packaging, advertising, and statements.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB

257.  Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XI
### (Quasi-Contract / Unjust Enrichment)

258.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

259.  Plaintiffs bring this claim individually and on behalf of the Class.

260.  To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

261.  Plaintiffs and Class Members conferred benefits on Defendant by purchasing the Products.

262.  Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members' purchases of the Product.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product was unfit for its intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Product if the true facts were known.

263.  Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XII
### (Breach of Express Warranty)

264.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

265.  Plaintiffs bring this claim individually and on behalf of the Class.

266.  Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Product.

267. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products packaging and through marketing and advertising, as described above.

268. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

269. As set forth above, Defendant purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is otherwise sustainable.

270. Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

271. Defendant breached express warranties about the Products and its qualities because despite Defendant's warranties that the Products are safe for consumption and is otherwise sustainable the Product is objectively not in fact safe for use and not sustainable. Thus, the Product did not confirm to Defendant's affirmations and promises described above.

272. Plaintiffs and each Class Member would not have purchased the Product had they known the true nature of the Products.

273. On April 8, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter, apprising Defendant of its breach of warranties. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations. The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiffs have chosen not to wait for Defendant's response. Plaintiffs have also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein. Accordingly, Plaintiffs' letter would not have served the purpose of the letter.

274.  As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)  For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel;

(b)  For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)  For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)  For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)  For prejudgment interest on all amounts awarded;

(f)  For an order of restitution and all other forms of equitable monetary relief;

(g)  For injunctive relief as pleaded or as the Court may deem proper;

(h)  For medical monitoring as a means to safeguard Plaintiffs' and Class Members' health and to mitigate any damages for future medical treatment; and

(i)  For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22cv0593-MMA-MSB

1    Dated: August 18, 2022       Respectfully submitted,

2

3                       **BURSOR & FISHER, P.A.**

4                       By:     */s/ L. Timothy Fisher*

5

6                       L. Timothy Fisher (State Bar No. 191626)
                        Sean L. Litteral (State Bar No. 331985)

7                       1990 North California Boulevard, Suite 940
                        Walnut Creek, CA  94596

8                       Telephone: (925) 300-4455
                        Facsimile:  (925) 407-2700

9                       Email: ltfisher@bursor.com
                                slitteral@bursor.com

10

11                       **BURSOR & FISHER, P.A.**
                      Joshua D. Arisohn (*pro hac vice* forthcoming)

12                       Alec M. Leslie (*pro hac vice* forthcoming)
                      888 Seventh Avenue

13                       New York, NY 10019
                      Telephone: (646) 837-7150

14                       Facsimile: (212) 989-9163
                      E-Mail: jarisohn@bursor.com

15                               aleslie@bursor.com

16

17                       *Attorneys for Plaintiffs and the Putative Class*

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT          CASE NO. 22CV0593-MMA-MSB

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Neil Hamman who resides in Ramona, California, and for Michael Stewart who resides in San Diego, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California. Additionally, Defendant transacts substantial business in this District, including purchases of the Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiff in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 18th day of August, 2022.

*/s/ L. Timothy Fisher*
L. Timothy Fisher

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 22CV0593-MMA-MSB



**null / ALL**
**Transmittal Number: 25711667**
**Date Processed: 10/12/2022**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Eva Seif<br>Cava Group, Inc.<br>702 H St NW<br>Fl 2<br>Washington, DC 20001-3874 |
| **Electronic copy provided to:** | Amit Patel<br>Hannah Johnson |

| | |
|---|---|
| **Entity:** | Cava Group, Inc.<br>Entity ID Number  4375772 |
| **Entity Served:** | Cava Group, Inc. |
| **Title of Action:** | Travelers Property Casualty Company of America vs. Cava Group, Inc. |
| **Matter Name/ID:** | Travelers Property Casualty Company of America vs. Cava Group, Inc. (13065439) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Orange County Superior Court, CA |
| **Case/Reference No:** | 30-2022-01283040-CU-IC-CXC |
| **Jurisdiction Served:** | District Of Columbia |
| **Date Served on CSC:** | 10/11/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Dentons US LLP<br>312-876-7370 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CAVA GROUP, INC.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA and THE
PHOENIX INSURANCE COMPANY

</td><td>

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

</td></tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, Orange County
700 Civic Center Drive
Santa Ana, CA 92701

</td><td>

CASE NUMBER:
*(Número del Caso):*
30-2022-01283040-CU-IC-CXC

Judge Randall J. Sherman

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
KATHRYN LAFFERTY IGNASH  (SBN 299694) DENTONS US LLP
4675 MacArthur Court, Suite 1250, Newport Beach, CA 92660
Telephone: 949 732 3700  E-mail: kathryn.ignash@dentons.com

| DATE: | 10/03/2022 | Clerk, by | *O. Lopez* | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | DAVID H. YAMASAKI, Clerk of the Court | *(Secretario)* O. Lopez | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**<br>STREET ADDRESS: 751 W. Santa Ana Blvd<br>MAILING ADDRESS: P.O. Box 1994<br>CITY AND ZIP CODE: Santa Ana CA 92702<br>BRANCH NAME:      Civil Complex Center | *FOR COURT USE ONLY* |
| SHORT TITLE: TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA vs. CAVA GROUP, INC. | |
| **NOTICE OF CONFIRMATION OF ELECTRONIC FILING** | CASE NUMBER:<br>30-2022-01283040-CU-IC-CXC |

The Electronic Filing described by the below summary data was reviewed and accepted by the Superior Court of California, County of Orange. In order to process the filing, the fee shown was assessed.

**Electronic Filing Summary Data**

Electronically Submitted By:  THE PHOENIX INSURANCE COMPANY
On Behalf of:                           THE PHOENIX INSURANCE COMPANY; CCMS ID: 80238431, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA; CCMS ID: 80238430
Transaction Number:            41392579
Court Received Date:            10/03/2022
Court Received Time:            01:35:06 PM
Filed Date:                             10/03/2022
Filed Time:                             01:35 PM
Fee Amount Assessed:          $0.00
Case Number:                        30-2022-01283040-CU-IC-CXC
Case Title:                             TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA vs. CAVA GROUP, INC.
Location:                               Civil Complex Center
Case Type:                            Insurance Coverage Claims
Case Category:                      Civil - Unlimited
Jurisdictional Amount:          > 25000

Case Title:

**Documents Electronically Filed/Received**     **Status**
Summons Issued and Filed                          Accepted


**Comments**
**Submitter's Comments:**

**Clerk's Comments:**

**Electronic Filing Service Provider Information**

Service Provider OneLegal
Email:            support@onelegal.com
Contact Person: Customer Support
Phone:            8009388815

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Kathryn Lafferty Ignash (SBN 299694)
DENTONS US LLP
4675 MacArthur Court, Suite 1250, Newport Beach, CA 92660
TELEPHONE NO.: 949 732 3700    FAX NO. *(Optional):* 949 732 3739
E-MAIL ADDRESS: kathryn.ignash@dentons.com
ATTORNEY FOR *(Name):* Travelers Property Casualty Company of America, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ORANGE**
STREET ADDRESS: 700 Civic Center Drive
MAILING ADDRESS: 700 Civic Center Drive
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

CASE NAME: Travelers Property Casualty Company, et al. v. CAVA Group, Inc.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 30-2022-01283040-CU-IC-CXC |
|---|---|---|
| ☒ **Unlimited** (Amount demanded exceeds $25,000) ☐ **Limited** (Amount demanded is $25,000) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: Judge Randall J. Sherman DEPT.: cx-105 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☒ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☒ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☒ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☒ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☒ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify):* 5
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: September 21, 2022

Kathryn Lafferty Ignash                              ▶ /s/ Kathryn Lafferty Ignash
_____                    _____
(TYPE OR PRINT NAME)                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]    **CIVIL CASE COVER SHEET**    Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

MC-025

| SHORT TITLE: Travelers Property Casualty Company of America and the Phoenix Insurance Company v. Cava Group, Inc. | CASE NUMBER: |
|---|---|

**ATTACHMENT** *(Number):* 1 _____

*(This Attachment may be used with any Judicial Council form.)*

ATTACHMENT TO FORM CM-010 - CIVIL CASE COVER SHEET

ATTORNEYS FOR PLAINTIFF TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA and THE PHOENIX INSURANCE COMPANY

DONNA J. VOBORNIK (pro hac vice forthcoming)
donna.vobornik@dentons.com
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606-6361
Telephone:     312 876 7370
Facsimile:      312 876 7934

JOEL M. GRACZYK (pro hac vice forthcoming)
joel.graczyk@dentons.com
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606-6361
Telephone:     312 876 8003
Facsimile:      312 876 7934

Page ____ 1 of 1 ____

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKAGE

NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):

Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its website as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ORANGE

## ADR Information

Introduction.

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

BENEFITS OF ADR.

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

Save Time. A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

Save Money. When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

Increase Control Over the Process and the Outcome. In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

Preserve Relationships. ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

Increase Satisfaction. In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

Improve Attorney-Client Relationships. Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

DISADVANTAGES OF ADR.

ADR may not be suitable for every dispute.

Loss of protections. If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

Less discovery. There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

Additional costs. The neutral may charge a fee for his or her services. If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

Effect of delays if the dispute is not resolved. Lawsuits must be brought within specified periods of time, known as statues of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

Arbitration. In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." Binding arbitration means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. Nonbinding arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

   Cases for Which Arbitration May Be Appropriate. Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

   Cases for Which Arbitration May Not Be Appropriate. If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

Mediation. In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

   Cases for Which Mediation May Be Appropriate. Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

   Cases for Which Mediation May Not Be Appropriate. Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

Neutral Evaluation. In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

Cases for Which Neutral Evaluation May Be Appropriate. Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

Cases for Which Neutral Evaluation May Not Be Appropriate. Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

Settlement Conferences. Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

ADDITIONAL INFORMATION.

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, at 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the telephone directories under "Arbitrators" or "Mediators"

Low cost mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA). For information regarding DRPA, contact:
- OC Human Relations (714) 480-6575, mediator@ochumanrelations.org
- Waymakers (949) 250-4058

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE). For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session. For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session. Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) programs is available on the Court's website at www.occourts.org.

| ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO.:<br>NAME:<br>FIRM NAME:<br>STREET ADDRESS:<br>CITY:                                        STATE:          ZIP CODE:<br>TELEPHONE NO.:                               FAX NO.:<br>E-MAIL ADDRESS:<br>ATTORNEY FOR (name): | FOR COURT USE ONLY<br><br>For your protection and privacy, please press the Clear This Form button after you are done printing this form. |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>JUSTICE CENTER:<br>☐ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045<br>☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512<br>☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595<br>☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500<br>☐ West – 8141 13ᵗʰ Street, Westminster, CA 92683-4593 | |
|---|---|
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |

Plaintiff(s)/Petitioner(s), _____

_____

and defendant(s)/respondent(s), _____

_____

agree to the following dispute resolution process:

☐ Mediation

☐ Arbitration (must specify code)
          ☐ Under section 1141.11 of the Code of Civil Procedure
          ☐ Under section 1280 of the Code of Civil Procedure

☐ Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐ I have an Order on Court Fee Waiver (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐ The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals. We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court, rule 3.720 et seq.

Date:_____      _____      _____
                       (SIGNATURE OF PLAINTIFF OR ATTORNEY)     (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date:_____      _____      _____
                       (SIGNATURE OF DEFENDANT OR ATTORNEY)   (SIGNATURE OF DEFENDANT OR ATTORNEY)

ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION

✓ **Plaintiff must serve a copy of these Guidelines with the Summons and Complaint.**



# GUIDELINES

## ALL COMPLEX CIVIL DEPARTMENTS

Welcome to the Complex Civil Litigation Program.  Orange County Superior Court is one of six courts designated by the California Judicial Council as pilot project courts to handle solely complex civil litigation.  These pilot courts were established to apply case management principles to improve the effective administration of justice by reducing the time and expense normally associated with the litigation of complex civil cases.  It has been our experience that these principles make it easier to prepare these cases for trial by providing a more orderly framework for the pre-trial phase of the litigation.

The result is a greater opportunity for early case resolution through mediation and settlement, and improving the way complex cases are tried by encouraging the use of technology.

Counsel's familiarity with the applicable *California Rules of Court ["Local Rules"], Local Rules – Superior Court of California, County of Orange,* and these *Guidelines* is expected.  The *Guidelines* should answer most procedural questions and assist you in feeling comfortable in our courtrooms.

## COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE

Counsel are expected to adhere to the provisions of the *California Attorney Guidelines of Civility and Professionalism.*  (State Bar of the State of California, adopted July 20, 2007, attached to these *Guidelines* as Appendix 1.)

1

## I. GENERAL MATTERS

1. When issued by the court, the provisions of the Case Management Order in the particular action shall govern over these *Guidelines*. Procedural matters not provided for in these *Guidelines* or in a Case Management Order shall be governed by the pertinent provisions of the California statutes, the California Rules of Court, and the California Standards of Judicial Administration. The purpose of these *Guidelines* is to supplement but not contradict the law governing civil procedure.

2. The Superior Court of California, County of Orange has established a system for e-filing in accordance with Code of Civil Procedure §1010.6 and California Rules of Court, rule 2.250 *et seq.* All papers filed in complex civil cases must be electronically filed unless a party has been specifically excused by the Court from the requirement, pursuant to the *Local Rules – Superior Court of California, County of Orange* ("local rules"), rule 308. To register for the program and to obtain additional information, go to: www.occourts.org/complexcivil/ .

3. Cross-complainants must serve a copy of these guidelines and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

4. Information about filing requirements or fees is available on the court's Internet home page at: http://www.occourts.org, or by telephone at (657) 622-5314. The local rules are available on the court's public internet home page.

5. Telephone appearances are conducted through **CourtCall**, pursuant to the provisions of California Rules of Court, Rule 3.670. Parties are encouraged to seek further information concerning guidelines and protocols from **CourtCall** at (310) 342-0888 or (888) 88-COURT.

## II. Initial Case Management Conference:

The Initial Case Management Conference shall take place in conformance with the requirements set forth in California Rules of Court, rule 3.750. The Initial Case Management Conference is generally scheduled approximately 90 days after the action is filed. Plaintiff is required to give notice of this conference date to all other parties. Thereafter, Status Conferences shall be set in consultation with the Court, according to the needs of the parties.

## III. Case Management Conference and Status Conference Statements:

The judges of the Civil Complex Center have determined that Judicial Council form CM-110, *Civil Case Management Statement* required by California Rules of Court, Rule 3.725(c) for some civil cases, is inadequate to provide the judges the information they need when determining how a particular complex case should be managed. ***Form CM-110 should not be used in any action designated or provisionally designated as***

*complex.* Instead, the parties shall file with the court either a Case Management Conference Statement or a Status Conference Statement as described below.

Counsel must file an updated Conference Statement for *each* Case Management or Status Conference. The Conference Statement is due no later than 5 court days prior to the hearing.

A Status Conference Statement may be filed as an alternative to the Case Management Conference Statement when appropriate. A Status Conference Statement is generally less detailed than a Case Management Conference Statement and is to be used to advise the court of progress or developments in the case which have occurred since the last review hearing.

A joint statement of the parties is preferred by the court whenever possible.

## IV. CASE MANAGEMENT ORDERS:

Case Management Orders are not required in all cases, but they may be helpful in cases where the sequencing and timing of key events is necessary in the management of the litigation and preparation of the case for trial. However, even if a Case Management Order is not necessary in a particular case, *all complex cases must be managed by counsel, or the court, or both.*

The goal of case management is to bring about a just resolution as speedily and economically as possible. To be effective, case management should be tailored to the needs of the particular litigation and to the resources available; make-work activity should be avoided. The parties or the court should develop and monitor an effective plan for the orderly conduct of pretrial and trial proceedings. A case management plan should prescribe a series of procedural steps, with firm dates, giving direction and order to the case as it progresses through pretrial proceedings to summary disposition or trial. The setting of interim time limits and deadlines is often a necessary part of an effective case management plan.

## V. LAW AND MOTION:

1. **Meet and Confer**: This court adopts the view that pre-filing conferences between counsel may be useful in avoiding useless or unnecessary motions. Therefore, prior to the hearing of any motion, petition or application, except applications to appear *pro hac vice* and motions to withdraw as counsel of record, all counsel and parties appearing in *propria persona* shall confer in a good faith attempt to eliminate the necessity of the hearing or resolve as many disputes as possible.

   Counsel for the moving party shall arrange the conference to meet and confer and, at least 3 calendar days before the hearing, file with the court a statement entitled "Meet and Confer," summarizing the issues remaining in dispute and the respective positions taken.

3

2. **Tentative Rulings**: Members of the Complex Civil Panel may publish tentative law and motion rulings by any system described in Local Rule 382.

3. **Off Calendars and Continuances:** In order to promote judicial economy and avoid wasting court resources, counsel for moving parties must notify the courtroom clerk as soon as possible if any matter will be taken off calendar. Stipulations between the parties to continue a matter must be approved by the court.

## VI. EX PARTE APPLICATIONS:

1. The court's consideration of an *ex parte* application will not interfere with or delay any trial in progress.  The moving party is expected to adhere to the provisions of California Rules of Court, Rule 3.1200 – 3.1207. All papers necessary to the determination of the application, including any proposed pleading, motion or order, must be submitted with the *ex parte* application. Counsel should contact the courtroom clerk to verify any specific deadlines for the submission of moving papers or other preferences applicable to that department.  Counsel may also contact the courtroom clerk to inquire if oral argument will be permitted, or if the court will rule based on the application and any written opposition.

2. The application shall include a declaration of Notice of Ex Parte Hearing and a proposed order; and shall state in the notice the irreparable harm, immediate danger or other basis for *ex parte* relief that will result if the requested relief is not granted until a regularly noticed motion may be heard.

## VII. MANDATORY SETTLEMENT CONFERENCES ("MSC's"):

Compliance with Local Rule 316 is required.

All of the judges at the Civil Complex Center are willing to help another judge in the settlement of a complex case depending upon the judge's available calendar.  If the parties agree to have a mandatory settlement conference conducted by a judge other than the assigned judge, the parties should first determine the other judge's availability before asking the assigned judge to order the settlement conference. However, it is not presumed that the judge to whom a case is assigned should not conduct the mandatory settlement conferences in his or her cases.  If a party objects to the trial judge's participation in the MSC, the party must advise the judge or the courtroom clerk of its objection prior to the setting of the MSC. Counsel are advised to check with the court to determine its preference in this regard.

## VIII. Pre-trial Conferences

1. A Pre-trial Conference may be scheduled 30-90 days before trial for the purpose of determining the readiness of the parties and     resolving procedural issues concerning the trial.  The goal of the Pre-trial Conference is to make the trial proceed as predictably and smoothly as possible.  **The Pre-trial**

4

**Conference is not a substitute for the Issues Conference required by Local Rule 317.**

2. At the Pre-trial Conference, counsel should be prepared to state whether his or her client will be using the electronic presentation of evidence at the trial. Using electronic equipment to present evidence at trial requires preparation, organization and cooperation by the parties. The court expects that the parties will work together in devising a protocol for the pre-marking of exhibits by using prefixes or a super-numeration system to designate the proponent of the evidence. Where there are multiple pages to a single exhibit, each page should be bates-stamped. Counsel should contact the courtroom clerk to determine if the trial judge has a specific preference for how exhibits should be marked.

3. In a case where it is reasonable to presume voluminous documents will be produced during discovery, counsel are urged to agree upon a protocol for the pre-marking of exhibits at the earliest time possible, preferably before the initiation of discovery and delivery to a document depository. It is less expensive to mark and index voluminous documents as they are deposited than when it is done on the eve of trial.

4. Counsel are required to cooperate throughout the trial so that one party's electronic exhibits are available to the other side to display during cross-examination.

5. The electronic version of documents, photographs, charts or other demonstrative evidence may be substituted for the actual exhibit at trial upon the stipulation of the parties and order of the court. This guideline is not meant to alter the rules of discovery or the obligation of a party to make available the original of a document for inspection by another party through discovery or at the Issues Conference.

6. Physical exhibits and documents are not required to be presented in a digitalized format. However, evidence which has not been presented in electronic form customarily will be ordered by the court returned at the end of the appeal period to the party which offered it. Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of the exhibits. Plaintiff will maintain joint exhibits unless the court orders otherwise.

## IX. Use of the Court's Evidence Presentation Systems

1. **On-Site Electronic Evidence Presentation Systems:** Every courtroom has the capability of being equipped with court-based evidence presentation systems for use by the parties. Counsel are strongly encouraged to take advantage of the benefits of the electronic presentation of evidence when in trial at the Civil Complex Center to enhance the orderly and effective presentation of evidence, reduce concerns about the custody and security of exhibits, and reduce the work and expense associated with the tagging, storing and transporting of exhibits. In an appropriate case, the court may require the

use of an electronic evidence presentation system. Electronic evidence presentation systems must be compatible with the court's infrastructure (video distribution amplifier, wiring, conduit, floor receptacles and connectors).

2. **Electronic Evidence Standard Format:** Counsel presenting evidence that is exclusively electronic in form must present the evidence in PDF file format and stored on CD-R. Whenever evidence is presented electronically, the physical custody of exhibits by the clerk is replaced by the electronic record of the exhibits. Evidence must be in sequential order with the exception of JPEG and MPEG files which shall be stored on separate discs. Counsel may also prepare electronic evidence using alternate non-proprietary formats subject to the approval of the court. The compact discs (CDs) must be labeled as follows:

Case #
Case Name
Exhibits _____ to _____
(Original or Backup copy)

The courtroom clerk will maintain an updated exhibit list. When evidence is electronically presented at the trial, the court may require counsel to periodically submit to the clerk an up-to-date CD containing exhibits received into evidence.

It is counsels' responsibility to identify and track redactions, modifications, and substitution of exhibits. Counsel are expected to be prepared to submit an up-to-date evidence CD with all redactions, modifications, and substitutions, as well as impeachment documents used, upon the courtroom clerk's request.

Impeachment exhibits are not pre-marked. However, counsel are responsible for having the document electronically recorded upon being offered into evidence (exhibit numbers may be reserved for this purpose).

If the jury will be provided the evidence in electronic format for its deliberation, the parties are required to meet and confer and submit the final joint exhibit list containing only those exhibits received into evidence. The CD used by the jurors must include the joint exhibit list and the electronically stored exhibits which have been entered into evidence. Submission of the joint evidence CD also serves as a stipulation that all exhibits presented in electronic form to the jury are complete and correct. Any disagreement must be brought to the attention of the court at the earliest reasonable time. Counsel must lodge two (2) evidence CDs of all exhibits received into evidence.

## X. TRIALS – MOTIONS IN LIMINE

Counsel should attempt to resolve evidentiary disputes at the Local Rule 317 Issues Conference before resorting to filing a motion *in limine.* It is frequently more productive of court time, and the client's money for counsel to informally address at the Issues Conference the issues which could be raised in motions *in limine* and, instead of a motion, present a stipulation to the court on uncontested issues. Matters of day-to-day

trial logistics and common professional courtesy should not be the subject of motions *in limine*. These are matters of common professional courtesy that should be accorded counsel in all trials. See, <u>Kelly v. New West Federal Savings</u> (1996) 49 Cal.App.4[th] 659,671.

APPENDIX 1
## California Attorney Guidelines of Civility and Professionalism
(Abbreviated, adopted July 20, 2007)

INTRODUCTION. As officers of the court with responsibilities to the administration of justice, attorneys have an obligation to be professional with clients, other parties and counsel, the courts and the public. This obligation includes civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, and cooperation, all of which are essential to the fair administration of justice and conflict resolution.

These are guidelines for civility. The Guidelines are offered because civility in the practice of Law promotes both the effectiveness and the enjoyment of the practice and economical client representation. The legal profession must strive for the highest standards of attorney behavior to elevate and enhance our service to justice. Uncivil or unprofessional conduct not only disserves the individual involved, it demeans the profession as a whole and our system of justice.

These voluntary Guidelines foster a level of civility and professionalism that exceed the minimum requirements of the mandated Rules of Professional Conduct as the best practices of civility in the practice of law in California. The Guidelines are not intended to supplant these or any other rules or laws that govern attorney conduct. Since the Guidelines are not mandatory rules of professional conduct, nor rules of practice, nor standards of care, they are not to be used as an independent basis for disciplinary charges by the State Bar or claims of professional negligence.

The Guidelines are intended to complement codes of professionalism adopted by bar associations in California. Individual attorneys are encouraged to make these guidelines their personal standards by taking the pledge that appears at the end. The Guidelines can be applicable to all lawyers regardless of practice area. Attorneys are encouraged to comply with both the spirit and letter of these guidelines, recognizing that complying with these guidelines does not in any way denigrate the attorney's duty of zealous representation.

SECTION 1. The dignity, decorum and courtesy that have traditionally characterized the courts and legal profession of civilized nations are not empty formalities. They are essential to an atmosphere that promotes justice and to an attorney's responsibility for the fair and impartial administration of justice.

SECTION 2. An attorney should be mindful that, as individual circumstances permit, the goals of the profession include improving the administration of justice and contributing time to persons and organizations that cannot afford legal assistance.

An attorney should encourage new members of the bar to adopt these guidelines of civility and professionalism and mentor them in applying the guidelines.

SECTION 3. An attorney should treat clients with courtesy and respect, and represent them in a civil and professional manner. An attorney should advise current and potential clients that it is not acceptable for an attorney to engage in abusive behavior or other conduct unbecoming a member of the bar and an officer of the court.

As an officer of the court, an attorney should not allow clients to prevail upon the attorney to engage in uncivil behavior.

An attorney should not compromise the guidelines of civility and professionalism to achieve an advantage.

SECTION 4. An attorney's communications about the legal system should at all times reflect civility, professional integrity, personal dignity, and respect for the legal system. An attorney should not engage in conduct that is unbecoming a member of the Bar and an officer of the court.

Nothing above shall be construed as discouraging the reporting of conduct that fails to comply with the Rules of Professional Conduct.

SECTION 5. An attorney should be punctual in appearing at trials, hearings, meetings, depositions and other scheduled appearances.

SECTION 6. An attorney should advise clients that civility and courtesy in scheduling meetings, hearings and discovery are expected as professional conduct.

In considering requests for an extension of time, an attorney should consider the client's interests and need to promptly resolve matters, the schedules and willingness of others to grant reciprocal extensions, the time needed for a task, and other relevant factors.

Consistent with existing law and court orders, an attorney should agree to reasonable requests for extensions of time that are not adverse to a client's interests.

7

SECTION 7. The timing and manner of service of papers should not be used to the disadvantage of the party receiving the papers.

SECTION 8. Written materials directed to counsel, third parties or a court should be factual and concise and focused on the issue to be decided.

SECTION 9. Attorneys are encouraged to meet and confer early in order to explore voluntary disclosure, which includes identification of issues, identification of persons with knowledge of such issues, and exchange of documents.

Attorneys are encouraged to propound and respond to formal discovery in a manner designed to fully implement the purposes of the California Discovery Act.

An attorney should not use discovery to harass an opposing counsel, parties or witnesses. An attorney should not use discovery to delay the resolution of a dispute.

SECTION 10. An attorney should consider whether, before filing or pursuing a motion, to contact opposing counsel to attempt to informally resolve or limit the dispute.

SECTION 11. It is important to promote high regard for the profession and the legal system among those who are neither attorneys nor litigants. An attorney's conduct in dealings with nonparty witnesses should exhibit the highest standards of civility.

SECTION 12. In a social setting or otherwise, an attorney should not communicate ex parte with a judicial officer on the substance of a case pending before the court, unless permitted by law.

SECTION 13. An attorney should raise and explore with the client and, if the client consents, with opposing counsel, the possibility of settlement and alternative dispute resolution in every case as soon possible and, when appropriate, during the course of litigation.

SECTION 14. To promote a positive image of the profession, an attorney should always act respectfully and with dignity in court and assist the court in proper handling of a case.

SECTION 15. An attorney should not take the default of an opposing party known to be represented by counsel without giving the party advance warning.

SECTION 16. An attorney should avoid even the appearance of bias by notifying opposing counsel or an unrepresented opposing party of any close, personal relationships between the attorney and a judicial officer, arbitrator, mediator or court-appointed expert and allowing a reasonable opportunity to object.

SECTION 17. An attorney should respect the privacy rights of parties and non-parties.

SECTION 18. An attorney should negotiate and conclude written agreements in a cooperative manner and with informed authority of the client.

In addition to other applicable Sections of these Guidelines, attorneys engaged in a transactional practice have unique responsibilities because much of the practice is conducted without judicial supervision.

SECTION 19. In addition to other applicable Sections of these Guidelines, in family law proceedings an attorney should seek to reduce emotional tension and trauma and encourage the parties and attorneys to interact in a cooperative atmosphere, and keep the best interests of the children in mind.

SECTION 20. In addition to other applicable Sections of these Guidelines, criminal law practitioners have unique responsibilities. Prosecutors are charged with seeking justice, while defenders must zealously represent their clients even in the face of seemingly overwhelming evidence of guilt. In practicing criminal law, an attorney should appreciate these roles.

SECTION 21. Judges are encouraged to become familiar with these Guidelines and to support and promote them where appropriate in court proceedings.

ATTORNEY'S PLEDGE. I commit to these Guidelines of Civility and Professionalism and will be guided by a sense of integrity, cooperation and fair play.

I will abstain from rude, disruptive, disrespectful, and abusive behavior, and will act with dignity, decency, courtesy, and candor with opposing counsel, the courts and the public.

As part of my responsibility for the fair administration of justice, I will inform my clients of this commitment and, in an effort to help promote the responsible practice of law, I will encourage other attorneys to observe these Guidelines.

(Rev. May 4, 2010)